**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**SEP 29 2003**

**PATRICK FISHER**
**Clerk**

PUBLISH

## UNITED STATES COURT OF APPEALS

### TENTH CIRCUIT

---

JIMMIE MARSHALL,

      Plaintiff-Appellant,

    v.

COLUMBIA LEA REGIONAL
HOSPITAL; NURSE JANE DOE;
CITY OF HOBBS; CAPTAIN TONY
KNOTT; SERGEANT WALTER
ROYE; OFFICER RODNEY
PORTER,

      Defendants-Appellees.

Nos. 02-2184 & 02-2190

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO
(D.C. NO. CIV 99-1363 LH/LCS)**

---

Submitted on the briefs:

Jimmie Marshall, *pro se* as Plaintiff-Appellant.

Barbara A. Patterson and Rodney M. Schumacher, Atwood, Malone, Turner & Sabin P.A., Roswell, New Mexico, for Defendants-Appellees Nurse Jane Doe and Columbia Lea Regional Hospital.

Gregory L. Biehler and Zachary S. Rigdon, Beall & Biehler, Albuquerque, New Mexico, for Defendants-Appellees City of Hobbs, Captain Tony Knott, Sergeant Walter Roye and Officer Rodney Porter.

---

Before **LUCERO** , **BALDOCK** , and **McCONNELL** , Circuit Judges.

**McCONNELL,** Circuit Judge.

This case involves troubling allegations regarding possible police misconduct by an officer in Hobbs, New Mexico.  We are not in a position to judge the truth of those allegations at this early stage in the litigation, but we conclude that the district court acted prematurely in granting summary judgment on all claims. [1]

In December, 1996, police officer Rodney Porter stopped Plaintiff-Appellant Jimmie Marshall, an African-American part-time resident of Hobbs, New Mexico, for an alleged traffic violation.  Officer Porter arrested Marshall, administered field sobriety tests, and took him to the Columbia Lea Regional Hospital for a blood test.  Among other legal claims, Mr. Marshall alleges that the traffic stop and arrest were made on account of his race and without probable cause, in violation of the Fourth Amendment and the Equal Protection Clause, and that the coerced blood test violated his rights under the Fourth Amendment and state tort law.  The defendants are Officer Porter, who conducted the traffic stop

[1] After examining the briefs and appellate record, and taking note that the Plaintiff-Appellant has presented this appeal *pro se* , this panel has determined unanimously that oral argument would not materially assist the determination of this appeal.  *See* Fed. R. App. P. 34(a)(2); 10th Cir. R. 34.1(G).  The case is therefore ordered submitted without oral argument.

and arrest, and Sergeant Walter Roye, who ordered the blood test. Additionally, plaintiff contends that Hobbs police chief Tony Knott and the City of Hobbs are liable for those actions under supervisory and municipal liability theories respectively. We will refer to these parties collectively as the "Hobbs Defendants." Other defendants include nurse Iris Goad and her employer, Columbia Lea Regional Hospital (the "Medical Defendants"), on account of their involvement in the blood test. Plaintiff seeks damages and other appropriate relief under 42 U.S.C. § 1983.

In a pair of orders dated June 18, 2002, the district court granted summary judgment for the defendants as to all claims. For the reasons set forth below, we reverse the judgment of the district court insofar as it granted summary judgment in favor of the Hobbs Defendants on the Equal Protection claim and the Fourth Amendment blood-test claim, and remand for further proceedings on these and the related state law claims. With respect to the remaining claims against the Hobbs Defendants, as well as all claims asserted against the Medical Defendants, we affirm the district court's grant of summary judgment.

## I. Background

A.  *Mr. Marshall's Arrest and Blood Test*

On December 26, 1996, Jimmie Marshall, an African-American self-employed electrician, was driving his gold Toyota pickup in Hobbs, New Mexico, when he noticed a police car parked by the side of the road with its lights off.

According to Mr. Marshall, the police officer – later identified as Officer Rodney Porter – followed his pickup for several blocks. While Mr. Marshall was stopped at an intersection with his left-turn signal blinking, Officer Porter pulled up alongside the pickup and "gaz[ed] intently at [Marshall's] face," which Marshall infers was for the purpose of ascertaining his race. Officer Porter contends that Mr. Marshall failed to stop at the stop sign, which Mr. Marshall denies. Officer Porter then activated his emergency lights, but Mr. Marshall continued to drive for more than two miles before coming to a stop at his residence. Mr. Marshall claims that he evaded the officer for several miles because he was fearful to stop his vehicle outside of the presence of witnesses, on account of the reputation of the Hobbs Police Department for racist practices. At that time, Mr. Marshall did not know Officer Porter and did not have any information about him. In the criminal complaint filed as a result of the incident, Officer Porter stated that Mr. Marshall accelerated to 100 miles per hour, drove through a four-way stop, and weaved from lane to lane, which Marshall denies. However, Officer Porter made no mention of these allegations in the affidavit he filed in this case describing the events of December 26, 1996, nor were they mentioned in Defendants' later pleadings.

On the street in front of Mr. Marshall's residence, the two men emerged from their vehicles. Officer Porter had drawn his pistol. His first words were to accuse Mr. Marshall of being on crack, which Marshall has consistently denied.

Defendants have proffered no evidence in support of this accusation. Officer Porter states that Mr. Marshall had the odor of alcohol on his breath, which Marshall does not deny, stating that he had imbibed one drink with his brother Alfred. Officer Porter arrested Mr. Marshall on various charges, including the traffic violation, driving under the influence, and resisting arrest. On the written citation form, in the space for indicating the gender of the person receiving the citation, Officer Porter wrote "B/M," presumably meaning black male.

After arresting Mr. Marshall, Officer Porter proceeded to search Marshall's truck. The search revealed a .40 caliber pistol under the driver's seat (apparently lawful), and Officer Porter claimed also to have found a small amount of a "green leafy substance," a contention Marshall denies. Mr. Marshall was taken to the city jail, where several sobriety tests were performed on him. Mr. Marshall passed two breathalyzer tests, but had difficulty completing the recitation of the alphabet (the "ABC test"). There is conflicting testimony about whether the horizontal gaze stymosis test was administered, and whether Mr. Marshall passed the finger-number test. [2]

Officer Porter then transported Mr. Marshall to the Columbia Lea Regional Hospital for blood testing. Mr. Marshall claims his request to put on his shoes

---

[2] Mr. Marshall's affidavit contains an allegation that Officer Porter used an offensive racial epithet. This contention was later repudiated by Mr. Marshall on the ground that it had been inserted by a legal assistant without his knowledge. Because it has been repudiated, we disregard the allegation for purposes of evaluating the grant of summary judgment.

was refused, despite the winter weather, and that his socks became soaked with urine that had pooled on the back floor of the police car. While waiting for Sergeant Roye to arrive at the hospital, Officer Porter interrogated the handcuffed Mr. Marshall for over twenty minutes, again accusing him of being on crack. ("I know you came from a crack house. You might as well admit it, because I know you went there to get some crack.") During this interrogation Mr. Marshall stated that the blood test might test positive for marijuana.

Thereafter, Sergeant Roye and Nurse Iris Goad entered the room. When Nurse Goad approached Mr. Marshall, he said, "Ma'am, you don't have my consent oral or written to take my blood. But if you're going – and I rather you not stick me with that needle. But if you're go going to take my blood, I'm not going to resist, but you don't have my consent oral or written." At that point Sergeant Roye told Nurse Goad, "Go-ahead and give it to him. I'll consent." Mr. Marshall then held his handcuffed arms in front of him for the blood test. The record contains a "consent form," initialed by Officer Porter, which states: "Refused to sign. Gave verbal consent." Two vials of blood were taken. The laboratory tests subsequently found no evidence of alcohol or other illegal drugs, but revealed the presence of THC, the active ingredient in marijuana, in Marshall's bloodstream.

After the events in the hospital, Mr. Marshall was returned to the jail, where he was confined for several hours before his mother obtained his release on

bail.  Later, he was charged in a criminal complaint with (i) possession of a controlled substance (marijuana), (ii) resisting, evading or obstructing a police officer, (iii) negligent use of a firearm (possession while intoxicated), (iv) reckless driving, (v) running a stop sign, and (vi) driving under the influence.   In May of 1997, the Assistant District Attorney for Lea County entered a *nolle prosequi* because the evidence in Marshall's case was suppressed.  The record does not contain any further information about that proceeding, or the legal basis for the suppression of the evidence.

B.    *Officer Porter's Alleged Pattern of Misconduct*

Slightly more than a year before the events in question here, Officer Porter was forced to resign from the Midland, Texas, police force after an internal investigation uncovered evidence of serious misconduct.  In response to Mr. Marshall's subpoena, Midland Police Chief John Urby provided documents from his department's internal investigation showing an extensive pattern of misconduct and violation of citizens' constitutional rights by Officer Porter when he was on the Midland force.  The Hobbs Defendants filed a motion *in limine* to exclude those documents from admission as evidence in this case.  The district court has not yet ruled on that motion.

If admissible, the Midland documents provide evidence that in more than thirty cases, Officer Porter falsely charged arrestees with possession of narcotics, seriously mishandled narcotics evidence, or both.  Further, in other cases, Officer

Porter was accused of planting evidence on arrestees, as well as using evidence to barter for sexual favors. According to the documents, Officer Porter denied the charges until after failing a polygraph test, when he admitted mishandling evidence.

The internal investigation concluded that Officer Porter's "credibility, integrity, and honesty have been impeached." Mem. from Deputy Chief John Urby to Chief Richard Czech dated Aug. 22, 1995, at 1, App. at 204. Deputy Chief Urby wrote, "Officer Porter failed to recognize that . . . he also had the responsibility of insuring that the rights of citizens were not violated." By the end of the investigation, even a good friend and staunch supporter of Officer Porter had concluded that "[t]hese acts leave us with no alternative except termination. Any other decision would make us guilty of negligent retention." Mem. from Lt. Jerry Compton to Deputy Chief John Urby dated Aug. 22, 1995, at 2, App. at 203. In a memo from then-Chief Richard Czech to Officer Porter, Porter was told:

> I cannot express in any terms the seriousness of this violation. Your trust as a police officer [is] to treat people fairly and equally under the law and under the constitution and as far as this police department is concerned you have violated these rights. You violated the very laws that you have been intrusted and sworn to uphold. You have breached the integrity of this Department and your credibility and honesty is to be questioned. As a result of your misconduct I am terminating your employment effective immediately.

Mem. from Chief Richard Czech to Officer Rodney Porter dated Aug. 23, 1995, at 2, App. at 201.

According to Mr. Marshall, a review of Officer Porter's arrest reports on cases where he had not logged in drug evidence

> shows that an overwhelming number of the suspects were black. Most of the rest were Hispanic surnamed. Virtually all were stopped for minor traffic violations such as seat belts, failing to signal a turn, failing to stop at a stop sign, or making a wide turn so as to touch the stripe of the other lane. Also, in many [cases] Porter either claimed to have secured consent or went ahead and conducted searches anyway.

Pl.'s Mem. in Support of Pl.'s Resp. to Defs.' Mots. for Summ. J., App. at 172. He claims that this pattern closely resembles the facts of his own case, and establishes a *modus operandi* under which Officer Porter targets individuals on the basis of their race and subjects them to traffic stops, arrests, and searches for pretextual drug violations not based on any evidence.

In further support of his equal protection claim, Mr. Marshall presented evidence regarding several lawsuits alleging civil rights violations against African-American citizens of Hobbs pending at the time his complaint was filed. Mr. Marshall also provided newspaper articles dealing with the racial tensions between the Hobbs Police Department and its African-American citizens,

including an incident involving Officer Porter in which an allegedly racially motivated arrest at a high school football game resulted in a riot.[3]

C.    *Procedural History*

In November of 1999, Mr. Marshall filed an action in federal district court against the Hobbs Defendants and the Medical Defendants.  The Medical Defendants filed a motion to dismiss.  On July 27, 2000, the district court issued a memorandum opinion and order criticizing the complaint for its vague and conclusory character and for failing to set forth any specific claims or causes of action.  The court granted Mr. Marshall leave to amend the complaint to "make good faith allegations on an equal protection violation or any constitutional violation except under the Fifth and Fourteenth Amendment, supported by the facts and the law."

On August 24, 2000, Mr. Marshall filed his First Amended Complaint alleging (i) Fourth Amendment violations for unreasonable search and seizure, (ii) Fourteenth Amendment substantive due process violations, (iii) Fourteenth Amendment equal protection violations, (iv) common law battery, (v) negligence *per se* (unconsented touching of the body), (vi) supervisory liability as to Chief Knott, and (vii) municipal liability as to the City of Hobbs.  Once again, the Medical Defendants filed a motion to dismiss, on which the district court ruled on

_____

[3] These cases, as well as others involving alleged civil rights violations by the Hobbs Police Department, are discussed *infra* note 13.

June 19, 2001. The district court noted the inconsistency in the phrasing of its first order, which barred Mr. Marshall from making any Fourteenth Amendment claims but granted leave to make good faith allegations regarding equal protection claims. The district court explained that it had intended to dismiss the substantive due process claims but to afford Mr. Marshall another chance to develop the equal protection claims. The court then dismissed Mr. Marshall's substantive due process claims, but denied the Medical Defendants' motion with regard to the remainder of the claims asserted in his First Amended Complaint.[4]

In late 2001, both sets of defendants filed motions for summary judgment. Mr. Marshall responded with three separate filings.[5] The district court held that Mr. Marshall's first reply contained only conclusory statements and did not raise

---

[4]Plaintiff does not challenge the dismissal of his substantive due process claim, and thus we do not consider it on appeal.

[5]In addition to his three filings responding to the summary judgment motions, on January 3, 2002, Mr. Marshall filed a Second Motion to Amend Plaintiff's Complaint, followed a week later by Plaintiff's Corrected Motion for Order to Allow His Second Amendment to the Complaint. In these filings, Mr. Marshall attempted to develop and articulate his causes of action, and asserted claims of negligent retention and supervision of Officer Porter and Sergeant Roye by Chief Knott and the City of Hobbs. On February 7, 2002, the magistrate judge filed an order denying the Second Motion to Amend Plaintiff's Complaint. He noted that the Initial Pretrial Report required that all pretrial motions be fully briefed by January 10, 2002, and that Mr. Marshall's motions failed to meet the deadline. The magistrate judge further noted that the case had been pending for over two years, that full-blown discovery had already been terminated for two months, and that the defendants had briefed their motions for summary judgment over a month before Mr. Marshall's motions were filed. Mr. Marshall filed no objection to this ruling. *See* Fed. R. Civ. P. 72(a).

any substantial issue of material fact in opposition to Defendants' claims. *Marshall v. Columbia Lea Regional Hosp.*, No. CIV 99-1363, slip op. at 4 n.3 (D.N.M. June 18, 2002), App. at 369. As to his second response, the court held that it violated local rules and was "deficient in many respects, including but not limited to the fact that it did not set forth specific facts, as provided in Rule 56, showing that there was a genuine issue for trial." *Id.* (citing Fed. R. Civ. P. 56(e)). Mr. Marshall's final response was the only filing setting forth specific facts supported by exhibits challenging Defendants' summary judgment motion. Attached to this filing was the Midland, Texas evidence summarized above, accompanied by an affidavit by the Midland police chief attesting that the materials were accurate copies of records that were made and maintained as part of the regular business activities of the Midland police department. Mr. Marshall introduced this evidence in support of his claims of equal protection violations and of municipal and supervisory liability against Chief Knott and the City of Hobbs. The district court ruled that this third response was a surreply filed out of time and without permission of the court.

Despite its conclusion that Plaintiff's three filings "utterly failed to comply with the local and federal rules," the district court "deem[ed] it more equitable to evaluate the merits of Defendants' proof as to each claim challenged by them." The court noted that in doing so, it "evaluated the merits" of Mr. Marshall's "factually supported submission" despite its procedural defects. *Marshall* at 4,

App. at 369. We presume this included the attachments. *See* Fed. R. Civ. P. 56(e). Reaching the merits, the district court issued two orders, both dated June 18, 2001, granting summary judgment in favor of the two sets of Defendants.

In its order granting summary judgment in favor of the Hobbs Defendants, the court first addressed Mr. Marshall's Fourth Amendment challenges to his traffic stop and subsequent arrest. The court concluded that the odor of alcohol on Mr. Marshall's breath and the alleged discovery of a "green leafy substance" in his pickup were inadequate to establish probable cause for Mr. Marshall's arrest. The district found, however, that the initial traffic stop "was based on an observed, though unspecified, traffic violation," which provided sufficient cause for the stop. *Marshall* at 4, App. at 369. Moreover, it was undisputed that after Officer Porter had activated his emergency lights, Mr. Marshall continued to drive and did not pull over for approximately two miles, which provided legally sufficient cause to arrest Marshall for the misdemeanor offense of resisting, evading or obstructing an officer. *Id.* at 7, App. at 372.

The district court then addressed and rejected Mr. Marshall's remaining constitutional claims. The district court concluded that the warrantless blood test was constitutional under the Supreme Court's ruling in *Schmerber v. California*, 384 U.S. 757 (1966). Based on Mr. Marshall's performance on the field sobriety tests, the court found that there was probable cause to justify the blood test, since passing the breathalyzer test "did not rule out the presence of other drugs in his

bloodstream." *Marshall* at 7, App. at 374. Further, although state law provides that a person under arrest for a motor vehicle offense may decline to submit to chemical tests without a warrant, and warrants are limited to cases involving serious accidents and felonies, the court noted that this "potential statutory violation is not one of constitutional dimension however. A violation of state law cannot give rise to a claim under section 1983. *See Jones v. City and County of Denver*, 854 F.2d 1206, 1209 (10th Cir. 1988)." *Id.* at 10, App. at 375.

Next, in a single paragraph, the district court rejected Mr. Marshall's equal protection claim:

> As stated above, the Court has concluded that the traffic stop, the arrest, and the blood test were all based upon probable cause, according to objective legal standards. In other words, the Court has concluded that all three of these government actions were based upon Mr. Marshall's conduct rather than his race. There is nothing in the record before the Court to indicate differential treatment of Mr. Marshall.

*Id.* at 11, App. at 376. The court made no mention of Mr. Marshall's evidence regarding Officer Porter's career in Midland, Texas.

Finally, the court dismissed Mr. Marshall's supervisory and municipal liability claims against Chief Knott and the City of Hobbs on the ground that no constitutional violations had occurred. Having dismissed all the federal claims, the district court declined to exercise supplemental jurisdiction over the remaining state law claims.

-14-

The district court filed a separate order granting summary judgment in favor of the Medical Defendants. The court reasoned that since the Medical Defendants were only involved in the blood test, they could be liable, if at all, only for that procedure. Relying on the reasoning set forth in the order pertaining to the Hobbs Defendants, the court dismissed all the federal claims with prejudice, and the state claims without prejudice.

D.     *The Current Appeal*

Although Mr. Marshall was represented by counsel in district court, he proceeds *pro se* in this appeal. He appeals the district court's determination that the traffic stop and subsequent search were reasonable, and we interpret this claim as raising a Fourth Amendment challenge. Further, he contends that the blood test was in violation of his Fourth Amendment rights, and that the district court erred in dismissing his supervisory and municipal liability claims. Finally, Mr. Marshall challenges the district court's dismissal of his state law claims. In a reply brief, Mr. Marshall additionally challenges the district court's dismissal of his Equal Protection claims. Because Mr. Marshall is proceeding *pro se* in this appeal, we liberally interpret his appeal to challenge all issues presented below that are addressed in his appellate briefs. *Croft v. Harder*, 927 F.2d 1163, 1164 (10th Cir. 1991) (citing *Haines v. Kerner*, 404 U.S. 519 (1972) (per curiam)).[6]

_____

[6] On appeal, Mr. Marshall contends that his *Miranda* rights were violated when he was questioned by police without presence of counsel. This issue was

(continued...)

## II. Analysis

This Court reviews the district court's grant of summary judgment *de novo*. *Mattioda v. White*, 323 F.3d 1288, 1291 (10th Cir. 2003). Summary judgment is appropriate if "there is no genuine issue as to any material fact" and "the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). We "examine[] the record and draw[] reasonable inferences therefrom in the light most favorable to the party opposing summary judgment." *Mattioda*, 323 F.3d at 1291 (internal quotation marks omitted).

A.  *Fourth Amendment Challenges to the Traffic Stop and Arrest*

The first issue raised in Mr. Marshall's appellate brief is the validity of the traffic stop and arrest under the Fourth Amendment. Mr. Marshall concedes that the "perceived" traffic violation "may have provided sufficient grounds for the initial stop," but maintains that "Officer Porter did not have justifiable reasons to arrest and seize the plaintiff/appellant."

Probable cause exists "where facts and circumstances within an officer's knowledge and of which he had reasonably trustworthy information are sufficient to warrant a prudent man in believing that an offense has been or is being

---

[6](...continued)
not presented in Mr. Marshall's original complaint or the First Amended Complaint, and is thus not properly before this Court. Moreover, violations of *Miranda* rights do not subject police officers to liability under § 1983. *Bennet v. Passic*, 545 F.2d 1260, 1263 (10th Cir. 1976). We therefore dismiss this claim. Additionally, as stated in note 4, *supra*, we do not consider Mr. Marshall's substantive due process claim.

committed." *Karr v. Smith*, 774 F.2d 1029, 1031 (10th Cir. 1985). In granting summary judgment with respect to this claim, the district court explained: "Defendants have presented evidence that Officer Porter's decision to stop Mr. Marshall was based on an observed, though unspecified, traffic violation," which "provides sufficient grounds to support the initial stop." *Marshall* at 4, App. at 369. Moreover, the court went on, it is "undisputed that after Officer Porter activated his emergency lights, Mr. Marshall continued to drive and did not pull over until he had reached his neighborhood, approximately two miles away," which provides "solid grounds to cite Mr. Marshall for resisting or evading an officer." *Id.* at 5, App. at 370. We agree.

Whether or not Mr. Marshall failed to obey the stop sign, which is disputed, the actual "stop" did not occur until after Mr. Marshall had driven for two miles without responding to the police officer's emergency lights. This behavior violated N.M. Stat. Ann. § 30-22-1 (forbidding "willfully refusing to bring a vehicle to a stop when given a visual or audible signal to stop, whether by hand, voice, emergency light, flashing light, siren, or other signal, by a uniformed officer in an appropriately marked police vehicle"), and constituted probable cause to support the stop, the citation, and the arrest. *See Atwater v. City of Lago Vista*, 532 U.S. 318, 354 (2001) (holding that even a minor violation is sufficient cause to justify an arrest).

Mr. Marshall does not deny that he drove two miles before stopping, but he mistakenly maintains that his delay in stopping was excusable because he needed to "get to a place that he felt safe" before complying with the officer's order to stop. That is not the law. Drivers are required to respond promptly when a police officer signals them to stop. Neither belief in innocence nor apprehensions regarding the police justify failure to obey a lawful order. *Cf. United States v. Villa-Chaparro,* 115 F.3d 797, 802 (10th Cir. 1997) (driver's failure to stop in response to flashing police lights contributes to a finding of reasonable suspicion).

B.     *Equal Protection Claims*

That Mr. Marshall's stop and arrest were based on probable cause does not resolve his more troubling claim that he was targeted by Officer Porter on account of his race. In *Whren v. United States*, 517 U.S. 806, 813 (1996), the Supreme Court held that claims asserting selective enforcement of a law on the basis of race are properly brought under the Equal Protection Clause, and that the right to equal protection may be violated even if the actions of the police are acceptable under the Fourth Amendment. As the court noted in *United States v. Avery*, 137 F.3d 343, 352 (6th Cir. 1997), "[t]he Equal Protection Clause of the Fourteenth Amendment provides citizens a degree of protection independent of the Fourth Amendment protection against unreasonable searches and seizures."

Racially selective law enforcement violates this nation's constitutional values at the most fundamental level; indeed, unequal application of criminal law to white and black persons was one of the central evils addressed by the framers of the Fourteenth Amendment. *See generally* William Nelson, *The Fourteenth Amendment: From Political Principle to Judicial Doctrine* 43-48 (1988); John Frank & Robert Munro, *The Original Understanding of "Equal Protection of the Laws,"* 1972 *Wash. U. L.Q.* 421, 445-46. In its modern form, however, racially selective law enforcement has only recently come to public attention, and state and federal law enforcement authorities are struggling to develop practical means for distinguishing between legitimate and illegitimate uses of race in the investigation and prevention of crime. *See generally* Samuel R. Gross & Debra Livingston, *Racial Profiling Under Attack*, 102 *Colum. L. Rev.* 1413 (2002); Albert W. Alschuler, *Racial Profiling and the Constitution*, 2002 *U. Chi. Legal F*. 163 (2002). Recently at the behest of President Bush, the Department of Justice promulgated guidelines designed to end racial profiling in federal law enforcement. *See* Department of Justice, Fact Sheet on Racial Profiling (June 17, 2003), *available at* http://www.usdoj.gov/opa/pr/2003/June racial_profiling _fact_sheet.pdf (last visited Aug. 12, 2003).

It is one thing for law enforcement administrators to identify the problem and to undertake administrative steps to eliminate the improper use of racial and ethnic stereotypes in law enforcement. It is more difficult to craft judicially

manageable standards for determining liability under § 1983. Broad discretion has been vested in executive branch officials to determine when to prosecute, *United States v. Armstrong*, 517 U.S. 456, 464 (1996), and by analogy, when to conduct a traffic stop or initiate an arrest. Police officers and departments should not lightly be put to the expense and risk of trial on charges of racial discrimination that may be easy to make and difficult to disprove. Not only does litigation divert prosecutorial resources and threaten an excessive judicial interference with executive discretion, but it could induce police officers to protect themselves against false accusations in ways that are counterproductive to fair and effective enforcement of the laws. For example, police may be induced to direct their law enforcement efforts in race-conscious ways by focusing law enforcement on neighborhoods with relatively few low-income, minority persons. Perhaps for these reasons, the Supreme Court has held that "to dispel the presumption that a prosecutor has not violated equal protection, a criminal defendant must present 'clear evidence to the contrary.'" *Id*. at 465 (quoting *United States v. Chemical Foundation, Inc*., 272 U.S. 1, 14-15 (1926)). Claims of racially discriminatory traffic stops and arrests should be held to a similarly high standard.

Neither this Court nor the Supreme Court has set forth the standards of proof needed for a plaintiff to withstand a motion for summary judgment in a case of an alleged racially discriminatory stop and arrest by a single officer. In

-20-

analogous contexts, however, the Court has "taken great pains to explain that the standard is a demanding one." *Armstrong*, 517 U.S. at 463. In *Wade v. United States*, 504 U.S. 181, 186 (1992), the Court held that a defendant is not entitled to an evidentiary hearing on a claim of a prosecutor's racially discriminatory refusal to request a downward departure on the basis of "generalized allegations of improper motive." He must "make . . . a substantial threshold showing." *Id.* (internal quotation marks omitted). In *Armstrong*, the Court held that a defendant is not entitled to discovery on a claim that the prosecuting attorney singled him out for prosecution on the basis of his race unless he can show "that similarly situated individuals of a different race were not prosecuted." 517 U.S. at 465.

The requirements for a claim of racially selective law enforcement draw on what the Supreme Court has called "ordinary equal protection standards." *Armstrong*, 517 U.S. at 465 (quoting *Wayte v. United States*, 470 U.S. 598, 608 (1985)). The plaintiff must demonstrate that the defendant's actions had a discriminatory effect and were motivated by a discriminatory purpose, *Armstrong*, 517 U.S. at 465. These standards have been applied to traffic stops challenged on equal protection grounds. *Chavez v. Illinois State Police*, 251 F.3d 612, 635-36 (7th Cir. 2001); *Farm Labor Org. Comm. v. Ohio State Highway Patrol*, 308 F.3d 523, 533-36 (6th Cir. 2002). The discriminatory purpose need not be the only purpose, but it must be a motivating factor in the decision. *Villanueva v. Carere*, 85 F.3d 481, 485 (10th Cir. 1996) (quoting *Village of*

-21-

*Arlington Heights v. Metropolitan Hous. Dev. Corp.*, 429 U.S. 252, 265-66 (1977)).  To withstand a motion for summary judgment, a plaintiff in a § 1983 suit challenging alleged racial discrimination in traffic stops and arrests must present evidence from which a jury could reasonably infer that the law enforcement officials involved were motivated by a discriminatory purpose and their actions had a discriminatory effect.

In general, the absence of an overtly discriminatory policy or of direct evidence of police motivation results in most claims being based on statistical comparisons between the number of black or other minority Americans stopped or arrested and their percentage in some measure of the relevant population.  *See, e.g.*, *Chavez*, 251 F.3d at 626.  This requires a reliable measure of the demographics of the relevant population, *id.* at 640-45, a means of telling whether the data represent similarly situated individuals, *id.*, and a point of comparison to the actual incidence of crime among different racial or ethnic segments of the population.  *Armstrong*, 517 U.S. at 469-70.  This case, however, is different, and perhaps more susceptible to traditional modes of proof before a jury.  Here, Mr. Marshall seeks to prove the racially selective nature of his stop and arrest not by means of statistical inference but by direct evidence of Officer Porter's behavior during the events in question, Officer Porter's own statements and testimony (the credibility of which can be evaluated by a jury), and Officer Porter's alleged

record of racially selective stops and arrests in drug cases under similar circumstances in Midland, Texas.

A challenge to the specific acts of a particular police officer bears some resemblance to a claim of racial discrimination in the use of peremptory jury challenges, which also involves the acts of a single state actor (the prosecutor) in the course of a single incident (the selection of the jury). In such cases, the Supreme Court has instructed that the court should "consider all relevant circumstances," including the prosecutor's "'pattern' of strikes against black jurors," and the prosecutor's "questions and statements," which may "support or refute an inference of discriminatory purpose." *Batson v. Kentucky*, 476 U.S. 79, 96-97 (1986). Similarly, a police officer's pattern of traffic stops and arrests, his questions and statements to the person involved, and other relevant circumstances may support an inference of discriminatory purpose in this context.

The district court held that "[t]here is nothing in the record before the Court to indicate differential treatment of Mr. Marshall." *Marshall* at 11, App. at 376. We cannot agree. Viewing the evidence in the light most favorable to the nonmoving party, Mr. Marshall, and drawing reasonable inferences in his favor, we conclude that the court below erred in granting summary judgment on Mr. Marshall's equal protection claim. We will analyze each fact Marshall invokes in support of his claim, starting with the events surrounding the traffic stop itself.

Mr. Marshall testified that he did not fail to stop at the stop sign or commit any other traffic violation in Officer Porter's presence. This testimony was not sufficient to establish lack of probable cause for the ultimate stop and arrest two miles down the road, but if accepted as true by the trier of fact, would be evidence that the officer's initial decision to pull Mr. Marshall over was pretextual. Moreover, Mr. Marshall testified – and Officer Porter did not dispute – that he was aware of the police car following him for several blocks before he came to the intersection where the alleged traffic violation occurred.[7] Since drivers aware of being observed by the police tend to be particularly cautious about traffic regulations, this lends credence to his account of the events.

Second, Mr. Marshall testified, and Officer Porter did not deny, that the officer made eye contact with him while stopped at the intersection prior to activating his emergency lights. From these facts it might reasonably be inferred that Officer Porter was ascertaining Mr. Marshall's race. The Hobbs Defendants have pointed to no testimony by Officer Porter or other evidence in the record that would supply a nondiscriminatory explanation for this behavior. The sequence of

---

[7] In the criminal complaint form filled out by Officer Porter on the day in question, he stated: "On 12-26-96 I saw a Gold Toyota pickup bearing N.M. 721 HTR traveling West on Alston from Thorp. The vehicle continued West and failed to stop at the stop sign at Grimes." If Officer Porter first saw Marshall near the intersection of Alston and Thorp, and observed as the pickup "continued West" to the intersection of Grimes and Snyder, this seems to confirm Mr. Marshall's claim that the police car followed him for several blocks. *See* map of Hobbs, New Mexico, *available at* http://maps.yahoo.com.

events is potentially significant, since this was the same intersection at which Officer Porter alleges that Mr. Marshall committed the traffic violation (presumably failure to stop at a stop sign). If, as it appears, Officer Porter took steps to determine Mr. Marshall's race after he committed the violation but before the police officer activated his emergency lights, it might reasonably be inferred that Mr. Marshall's race played a part in the decision to initiate the stop.

The first words out of Officer Porter's mouth when he confronted Mr. Marshall after the stop were a cryptic accusation that Mr. Marshall was on crack. ("Is a few rocks worth all that?") Officer Porter reiterated this accusation during interrogation at the station house, and again at the hospital. Neither Officer Porter in his affidavit, nor the other Hobbs Defendants in their submissions to this Court or the district court deny that these exchanges took place or dispute Mr. Marshall's description of their content. Further, Defendants failed to offer any evidence explaining why Officer Porter made the accusations.[8] We refer to these exchanges as "accusations" rather than an "interrogation" because, as reported by

---

[8] In his affidavit, Officer Porter states that he "smelled the odor of alcoholic beverage on his person" and "observed a green leafy substance on the front seat of the vehicle Mr. Marshall was driving." Moreover, he states that Mr. Marshall's performance on the horizontal gaze stymosis test "indicat[ed] Mr. Marshall was under the influence of a drug or alcohol." Even accepting all of these statements as true (except for the odor of alcohol, Mr. Marshall disputes each), we note that they supply no reason for Officer Porter to have suspected Mr. Marshall of drug use at the time he first lodged the accusation, and no reason for Officer Porter to suspect Mr. Marshall of being on crack, as opposed to alcohol or marijuana.

Mr. Marshall, the tone and content was accusatory and conclusory rather than interrogative. We do not suggest that a police officer requires probable cause, or even reasonable suspicion, before asking a suspect who has been arrested for probable cause questions about possible criminal activity, but in the context of this case as a whole, a jury might reasonably infer from these exchanges that Officer Porter was acting on the basis of stereotype or prejudice rather than evidence.

The record also reflects that on the citation form, in the box designated for the gender of the cited driver, Officer Porter wrote "B/M," making a racial designation where none was called for. Possibly, this reflects unwritten police policy or has some other nondiscriminatory explanation, but the Hobbs Defendants have not suggested one. A jury might also think it significant – at least as it bears on Officer Porter's credibility – that the officer wrote on the original criminal complaint that Mr. Marshall accelerated to 100 miles per hour, drove through a four-way stop, and weaved from lane to lane, but later made no mention of these remarkable corroborating facts in his sworn affidavit in this case about what happened that day. *Cf. McGarry v. Board of County Com'rs*, 175 F.3d 1193, 1200 (10th Cir. 1999) (in employment discrimination context, change of story tends to show pretext); *Cole v. Ruidoso Mun. Schools*, 43 F.3d 1373, 1382 (10th Cir. 1994) (same).

The record thus contains evidence – disputed, to be sure – that Mr. Marshall did not commit the traffic violation for which he was initially stopped, that Officer Porter ascertained Mr. Marshall's race before initiating the stop, that he made repeated accusations that Mr. Marshall was on crack with no apparent basis, that he made an apparently unnecessary note of Marshall's race, and that his account of the events changed dramatically between the date of the incident and the date of his affidavit. Other than to insist that Mr. Marshall committed the traffic violation and thus that there was probable cause for the stop and the arrest, the Defendants offer no nondiscriminatory explanation for these aspects of Officer Porter's conduct in this case.

It is a close question whether this is sufficient to require the Hobbs Defendants to go to trial on the allegations of racial discrimination. *Compare Johnson v. Crooks*, 326 F.3d 995, 999-1000 (8th Cir. 2003) (finding it error not to dismiss equal protection claim where police officer observed a motorist's race, followed her closely for eleven miles, stopped her for a traffic violation she denied, and later contacted her apparent employer), *with id.* at 1001 (Lay, J., dissenting on the same facts). But there is more.

Mr. Marshall presented evidence regarding extensive alleged misconduct by Officer Porter during his prior employment as a police officer in Midland, Texas. In a memo terminating Officer Porter's employment, the Midland police chief stated that Porter had failed "to treat people fairly and equally under the law."

Mem. from Midland Police Chief Richard Czech to Rodney Porter, dated Aug. 23, 1995, at 2, App. at 201. In his third filing in district court in response to the Defendants' motions for summary judgment, Mr. Marshall contended that an analysis of Officer Porter's arrest records obtained from the Midland investigation would establish a pattern of discrimination against blacks and Hispanics, and a *modus operandi* similar to that in his case. If admissible, these documents, together with the other facts of record pertaining to the events of December 26, 1996, may be sufficient to create a triable issue on Mr. Marshall's claim of racially selective law enforcement.

The district court made no reference to the Midland evidence in its orders granting summary judgment. Additionally, Defendants have not offered any analysis or explanation of these documents either before the district court or in their appellate briefs, nor have they briefed the admissibility of these documents to this Court. Without the benefit of the parties' views, we decline to analyze the documents and thus reach no conclusion regarding their probative value. That question must be addressed on remand. Once the documents have been analyzed, the district court will be able to determine whether they establish a "pattern" of traffic stops and arrests that raises an inference of racial discrimination, *cf. Batson*, 476 U.S. at 97, or provide evidence that similarly situated individuals of a different race received differential treatment, *cf. Armstrong*, 517 U.S. at 465-66.

In their Reply in Support of Hobbs Defendants' Motion for Summary Judgment, the Hobbs Defendants raised certain objections to the admissibility of the Midland documents. As far as the record reveals, the district court never ruled on those objections, though it "evaluated the merits" of Mr. Marshall's "factually supported submission" to which these materials were attached. We therefore reverse the grant of summary judgment in favor of the Hobbs Defendants on the equal protection claims, and remand to the district court to determine the admissibility of the Midland documents and to reconsider the Hobbs Defendants' motion for summary judgment in light of this opinion.

C.      *Fourth Amendment Challenge to the Warrantless Blood Test*

The next issue raised by Mr. Marshall in his appellate brief is whether administration of a blood test without a warrant was in violation of the Fourth Amendment. The district court held that the blood test was justified under *Schmerber v. California*, 384 U.S. 757 (1966). The Hobbs Defendants also contend that Mr. Marshall consented to the blood test, making it constitutional under *Schneckloth v. Bustamonte*, 412 U.S. 218, 219 (1973). We consider each of these arguments in turn.

1.      <u>Was the warrantless blood test justified under *Schmerber v. California*?</u>

It is undisputed that, at the instruction of Officers Porter and Roye, a nurse employed by Defendant Columbia Lea Regional Hospital administered a blood

test to Mr. Marshall without first obtaining a warrant from a neutral magistrate. Mr. Marshall contends that this violated "[t]he right of the people," protected by the Fourth Amendment as applicable to the states through the Fourteenth Amendment, "to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. State actors administering a blood test without warrant or consent may be subject to suit under § 1983. *Dubbs v. Head Start, Inc.*, 336 F.3d 1194, 1207 (10th Cir. 2003).

It is a basic principle of Fourth Amendment law that searches and seizures inside the home without a warrant are presumptively unreasonable unless the police can show both probable cause and the presence of exigent circumstances. *United States v. Davis*, 290 F.3d 1239, 1242 & n.3 (10th Cir. 2002) ("Probable cause accompanied by exigent circumstances will excuse the absence of a warrant."); *see also Payton v. New York*, 445 U.S. 573, 590 (1980) ("Absent exigent circumstances, [the] threshold may not be reasonably crossed without a warrant."); *Welsh v. Wisconsin*, 466 U.S. 740, 749 (1984); *Coolidge v. New Hampshire*, 403 U.S. 443, 474-75 (1971). In *Schmerber*, the Court held that intrusions into the body deserve at least as much protection as is afforded to intrusions into the home. 384 U.S. at 770 ("Search warrants are ordinarily required for searches of dwellings, and absent an emergency, no less could be required where intrusions of the human body are concerned."). It follows that a warrantless blood test, performed without consent, is presumptively unreasonable

-30-

unless the state actors involved had probable cause and exigent circumstances sufficient to justify it.

In this case, we assume, as the district court held, that Mr. Marshall's mixed performance on the field sobriety tests provided probable cause for the blood test. The harder question is whether there were exigent circumstances. This requires careful consideration of the legal and factual context, in light of the purposes of the exigent circumstances doctrine. "[T]he scope of a warrantless search must be commensurate with the rationale that excepts the search from the warrant requirement." *Cupp v. Murphy*, 412 U.S. 291, 295 (1973). Although the opinion did not use the terminology of "exigent circumstances," *Schmerber* is the governing precedent regarding the application of the exigent circumstances doctrine to warrantless blood tests. *See Illinois v. McArthur*, 531 U.S. 326, 331 (2001) (describing *Schmerber* as involving "exigent circumstances"); *Winston v. Lee*, 470 U.S. 753, 759 (1985) (same).

The defendant in *Schmerber* was hospitalized after an automobile accident that resulted in serious injuries to himself and a passenger. *Schmerber*, 384 U.S. at 758. Based on various symptoms of drunkenness, including the smell of alcohol on his breath, police arrested him for driving under the influence. *Id.* at 768-69. Although ultimately prosecuted for a misdemeanor, he was subject to prosecution for a felony because of the injury to the passenger. *Id.* at 768 n.12. At the instructions of the police, but over the defendant's objection and without a

warrant, medical personnel at the hospital administered a blood test, which produced evidence of his intoxication. *Id*. at 758-59.

The Court held that the warrantless blood test did not violate the Fourth Amendment. The Court opened its discussion noting that bodily intrusions, such as blood tests, affect the "interests in human dignity and privacy which the Fourth Amendment protects" no less than searches of dwellings. *Id.* at 769. Search warrants are "ordinarily required" for searches of dwellings, and the "importance of informed, detached and deliberate determinations of the issue whether or not to invade another's body in search of evidence of guilt is indisputable and great." *Id*. at 770. The Court noted, however, that under the "special facts" of the case, "there was no time to seek out a magistrate and secure a warrant" before the blood alcohol level had diminished. *Id.* at 770-71. Because the police "might reasonably have believed that . . . the delay necessary to obtain a warrant, under the circumstances, threatened the destruction of evidence," the Court held that the warrantless search comported with the Fourth Amendment. *Id.* at 770 (internal quotation marks omitted). However, the Court specifically limited its holding to the facts before it:

> [W]e reach this judgment only on the facts of the present record. The integrity of an individual's person is a cherished value of our society. That we today [h]old that the Constitution does not forbid the States minor intrusions into an individual's body under stringently limited conditions in no way indicates that it permits . . . intrusions under other conditions.

*Id.* at 772.

The district court upheld the warrantless blood test in this case on analogy to *Schmerber*. As in *Schmerber*, police had probable cause to suspect Mr. Marshall of the crime of driving under the influence, and as in *Schmerber*, the "delay necessary to obtain a warrant under the circumstances threatened destruction of the evidence." *Marshall* at 10, App. at 375.

Mr. Marshall's brief can be liberally construed to argue that *Schmerber* is distinguishable in at least one important respect: state law does not authorize New Mexico police to compel a blood test in a misdemeanor case involving no physical injury, *even with a warrant*. When a crime is not important enough to justify a warranted search, it is not important enough to justify an "exigent circumstances" search. Under the facts of *Schmerber* – a serious accident with the potential of a felony prosecution – state law authorized police to procure a warrant for a blood test, and if time and circumstances had permitted, the police could have done so. It was only "the delay necessary to obtain a warrant," which created the "emergency," which justified the warrantless search. *Schmerber*, 384 U.S. at 770. By contrast, in this case no warrant was available by law for a test of Mr. Marshall's blood.

N.M. Stat. Ann. § 66-8-111(A) (Michie 1998)[9] provides in relevant part:

_____

[9] Since Mr. Marshall's arrest, the statute has been slightly modified. The changes, however, have no bearing on the issue raised by this case. *See* N.M. Stat.

(continued...)

> If a person under arrest for violation of an offense enumerated in the Motor Vehicle Code. . . refuses upon request of a law enforcement officer to submit to chemical tests designated by the law enforcement agency as provided in section 66-8-107 NMSA 1978, none shall be administered except when a municipal judge, magistrate or district judge issues a search warrant authorizing chemical tests as provided in section 66-8-107 NMSA 1978 upon his finding in a law enforcement officer's written affidavit that there is probable cause to believe that the person has driven a motor vehicle while under the influence of alcohol or a controlled substance, thereby causing the death or great bodily injury of another person, or there is probable cause to believe that the person has committed a felony while under the influence of alcohol or a controlled substance and that chemical tests as provided in section 66-8-107 NMSA 1978 will produce material evidence in a felony prosecution.

The statute describes two scenarios under which a magistrate can issue a warrant for chemical tests, including a blood test: (i) upon probable cause to believe that a person has driven while under the influence of alcohol or a controlled substance and has thereby caused the death or great bodily injury of another person; and (ii) upon probable cause to believe that the person has committed a *felony* while under the influence of alcohol or a controlled substance and that chemical tests will produce material evidence in a *felony* prosecution. Under New Mexico law, the driver's license of a person arrested for driving under the influence may be revoked if he refuses to submit to a chemical test. N.M. Stat. Ann. § 66-8-

---

[9](...continued)
Ann. § 66-8-111(A) (Michie, LEXIS through 2003 Sess.).

111(B).  But if the subject refuses to submit to the test, the statute expressly

forbids the police from administering it without a warrant.  *Id*. § 66-8-111(A).

Reading the facts in the record in the manner most favorable to the party

opposing summary judgment, we infer that no search warrant could lawfully have

been obtained to compel a test of Mr. Marshall's blood.  Because there is no

evidence that Mr. Marshall caused death or great bodily injury, or even an

accident, the first scenario clearly does not apply.  Nor was a warrant authorized

under the second scenario.  Under New Mexico law, a first conviction of driving

under the influence of a controlled substance is a petty misdemeanor.  *See id*. §

66-8-102(E)[10] (prescribing no more than 90 days' imprisonment and/or a $500

fine for first offense); *id*. § 31-1-2(L) (categorizing crimes with sentences of less

than six months as petty misdemeanors).  Nothing in the record indicates that Mr.

Marshall had a prior conviction for driving under the influence.[11]  Nor could Mr.

Marshall's alleged drug possession justify a warrant for a blood test.  New

Mexico Statutes § 30-31-23(B)(2) provides that possession of less than eight

ounces of marijuana is not a felony.  Even assuming that Officer Porter's vague

---

[10]  Although since Mr. Marshall's arrest, this statute has been modified. several times, the maximum penalty has remained constant.  *See* notes to N.M. Stat. Ann. § 66-8-102(E) (Michie, LEXIS through 2003 Sess.).

[11] Moreover, Supreme Court precedent suggests that when the legality of a search depends on the classification of a crime, which in turn depends on whether the defendant was a repeat offender, police officers must assume that they are investigating the lesser offense in the absence of actual knowledge of the prior offense.  *Welsh*, 466 U.S. at 747 n.6.

references to a "green leafy substance" on the front seat of Mr. Marshall's truck established probable cause for an arrest for possession of marijuana, which the district court specifically rejected, *Marshall* at 6, App. at 371 (citing *Texas v. Brown*, 460 U.S. 730 (1983)), it certainly did not establish probable cause for arrest for the possession of the eight ounces required for a felony.

We can reasonably infer from the evidence, therefore, that Officer Porter would not have been able to obtain a search warrant under the circumstances of this case, even if he had time to do so. Because the exigent circumstances in *Schmerber* were based entirely on the "emergency" circumstances created by the delay necessary to obtain a warrant, it follows that *Schmerber* is distinguishable. It would be strange to hold that a police officer may obtain a blood sample on the basis of exigent circumstances *without* a warrant, when he could not have lawfully conducted the same search *with* a warrant. The rationale for the exigent circumstances doctrine is to avoid the loss of evidence due to the time required for obtaining a warrant – not to enable police to obtain evidence in cases of alleged violations too trivial to support a warrant.

This conclusion in no way conflicts with this Court's long line of cases holding that violations of state law by state officials in the course of state law enforcement activities do not create actionable Fourth Amendment claims. *See, e.g.*, *United States v. Green*, 178 F.3d 1099, 1105 (10th Cir. 1999) (quoting *United States v. Le*, 173 F.3d 1258, 1264 (10th Cir. 1999) ("It is, however, well

established in this circuit that in federal prosecutions the test of reasonableness in relation to the Fourth Amendment protected rights must be determined by Federal law even though the police actions are those of state police officers.") (internal quotation marks omitted)); *United States v. Price*, 75 F.3d 1440, 1443-44 (10th Cir. 1996) (same). Our point is not that the Hobbs Defendants are subject to liability under § 1983 for violation of the New Mexico statute, but rather that the New Mexico statute determines whether the exigent circumstances recognized in *Schmerber* are present here.

The Supreme Court has instructed that under the doctrine of exigent circumstances, the lawfulness of a search is determined by balancing privacy concerns against those of law enforcement. *McArthur*, 531 U.S. at 331. Exigent circumstances, in the context of a search by state officials for evidence of a state offense, is measured in part by the relative importance given by state law to the evidence sought through the warrantless search. *See Welsh*, 466 U.S. at 750-51, 754 (finding no exigent circumstances on the basis of minimal state interest as expressed through classification of offense under state law); *Howard v. Dickerson*, 34 F.3d 978, 982 (10th Cir. 1994) (same); *Patzner v. Burkett*, 779 F.2d 1363, 1369 (8th Cir. 1985) (same); *see also United States v. Flowers*, 336 F.3d 122, 1229-1231 (10th Cir. 2003).

*Welsh* provides an illustration of this principle. There, the defendant's car swerved off the road, coming to a stop in an open field. *Welsh*, 466 U.S. at 742.

A witness, noticing the car driving erratically, contacted the police, but by the time they arrived defendant Welsh had walked away from the scene. *Id.* By checking the vehicle identification number, police were able to identify the car as belonging to Welsh, and proceeded to his home without first obtaining a warrant. *Id.* Police entered his home and took him to the station house to administer a breathalyzer test. *Id.* at 743. Welsh refused to take the test and as a result was charged and convicted in two separate, but related, proceedings: one concerning his refusal to submit to a breathalyzer test and the second relating to driving while intoxicated. *Id.* The Wisconsin Supreme Court upheld the convictions, ruling that the warrantless arrest was justified under the doctrine of exigent circumstances. *Id.* at 747-48.

The Supreme Court reversed both convictions. Although the government argued that the need to preserve the evidence of Welsh's blood alcohol level created exigent circumstances, the Court held that preservation of evidence did not justify a warrantless in-home arrest if the offense for which probable cause was said to exist is "relatively minor." *Id.* at 750. In determining the "gravity of the underlying offense," the Court looked to the substantive state law, finding that it is "the best indication of the State's interest." *Id*. at 751, 754. In that case, the offense which Welsh was suspected to have committed was "a noncriminal, civil forfeiture offense, for which no imprisonment is possible." *Id.* at 754. The Court concluded that "[g]iven this expression of the State's interest, a warrantless home

arrest cannot be upheld simply because evidence of the petitioner's blood-alcohol level might have dissipated while police obtained a warrant." *Id.* at 754. The Court did not specify how serious a crime must be under state law to justify application of the exigent circumstances doctrine, though it cited with apparent approval a state supreme court decision adopting a rule holding that "misdemeanors are excluded." *Id.* at 753 (quoting *State v. Guertin,* 461 A.2d 963, 970 (Conn. 1983)); *see also United States v. Aquino*, 836 F.2d 1268, at 1271 n.4 (10th Cir. 1988).

Similarly, this Court has held that "[t]o determine the existence of an exigency, a court must consider the gravity of the offense." *Howard*, 34 F.3d at 982; *see also Flowers*, 336 F.3d at 1229-31. As in *Welsh*, this Court in both *Howard* and *Flowers* considered state law relevant in determining whether a particular alleged crime was serious enough to support a warrantless arrest under the exigent circumstances doctrine. We see no reason why a similar analysis would not be applicable to the exigent circumstances doctrine as applied to warrantless searches as well as warrantless arrests. *See* William A. Schroeder, *Factoring the Seriousness of the Offense into Fourth Amendment Equations – Warrantless Entries into Premises: The Legacy of* Welsh v. Wisconsin, 38 *U. Kan. L. Rev* . 439, 450 (1990) ("Most judicial and scholarly discussions of warrantless fourth amendment entries predicated on alleged exigencies do not

distinguish between entries to search and entries to seize or arrest."); *see also id.* at 457-58.

New Mexico's statutes clearly signal the State's limited interest in coerced testing of the blood of a motorist charged with a petty misdemeanor. More significantly, New Mexico's determination regarding the absence of exigency is clearly displayed by the fact that New Mexico law does not grant a magistrate authority to issue a warrant for this search. If a state does not permit obtaining evidence from the bloodstream, even under the protection of a warrant based on probable cause, it perforce demonstrates minimal interest in the evidence to be obtained by the search. State actors then cannot turn around and seek shelter under the exigent circumstances exception to the Fourth Amendment's warrant requirement. *See Welsh*, 466 U.S. at 753-54.

This approach is assumed within *Schmerber* itself. After noting that warrants are generally required absent specific emergency circumstances, *Schmerber* held that "The officer in the present case . . . might reasonably have believed that he was confronted with an emergency, in which the delay necessary to *obtain a warrant*, under the circumstances, threatened the destruction of the evidence." 384 U.S. at 770 (emphasis added and internal quotation marks omitted). Implicit in this holding is that exigent circumstances exist only when a warrant would be available but for the shortage of time. That is not true in this case.

## 2. Did Marshall Consent to the Blood Test?

Defendants contend in the alternative that the search administered to Mr. Marshall was consensual, and therefore constitutional. *See Schneckloth*, 412 U.S. at 219 (search pursuant to consent does not violate the Fourth Amendment); *Dubbs,* 336 F.3d at 1207 (same); *United States v. Pena-Sarabia*, 297 F.3d 983, 986 (10th Cir. 2002) (same).

Immediately prior to the blood test, Mr. Marshall told Nurse Goad, "Ma'am, you don't have my consent oral or written to take my blood. But if you're going – and I rather you not stick me with that needle. But if you're go going to take my blood, I'm not going to resist, but you don't have my consent oral or written." Defendants claim that Mr. Marshall's statement should be interpreted as assenting to the blood test, thereby removing any liability under the Fourth Amendment.

Defendants' argument is based on New Mexico's statutory scheme governing blood tests administered to motorists suspected of driving under the influence of a controlled substance. Under New Mexico's Implied Consent Act, N.M. Stat. Ann. § 66-8-111, a motorist may refuse to submit to a chemical test, but if he does so, his driver's license may be revoked.

Defendants contend that Mr. Marshall is trying to have it both ways. They argue that the statement to Nurse Goad was craftily constructed to refuse consent for the purpose of constitutional liability, while avoiding revocation of his license

-41-

under New Mexico law. In other words, Mr. Marshall raised the objection to preserve a future § 1983 claim against Defendants, but assented to the search in order to save his driver's license. Mr. Marshall, by contrast, claims that he expressed unqualified objection to the blood test, and that his decision not to offer physical resistance while handcuffed and in the presence of two officers cannot be construed as consent.

Whether a search is consensual is a question of fact to be determined by the totality of the circumstances. *United States v. Pena*, 143 F.3d 1363, 1366 (10th Cir. 1998). We find that there is a genuine issue of material fact regarding whether Marshall consented to the search, and remand to the district court for further factfinding.[12]

D.   *Municipal and Supervisory Liability*

Mr. Marshall's claims of supervisory and municipal liability were dismissed by the district court on the ground that these claims are premised on constitutional violations. Since we have reversed the grant of summary judgment and remanded to the district court the Equal Protection claim and the Fourth Amendment claim based on the blood test, we reverse the district court's disposition of these claims and remand for further proceedings.

---

[12] The Hobbs Defendants have not raised or briefed qualified immunity to this Court, and we will not address the issue *sua sponte*. Because they raised the issue in district court but prevailed on an alternative ground which has now been reversed, they are free to raise the defense on remand.

-42-

Municipalities can be sued for monetary, declaratory, or injunctive relief for deprivations of constitutional or civil rights. *Monell v. Department of Soc. Servs.*, 436 U.S. 658, 690 (1978). A municipality, however, cannot be held liable for the actions of its employees under the theory of *respondeat superior*. *Seamons v. Snow*, 206 F.3d 1021, 1029 (10th Cir. 2000) (citing *Monell*, 436 U.S. at 691). Plaintiffs seeking to impose liability on a municipality under section 1983 must identify a municipal "policy" or "custom" causing their injury. *Board of County Com'rs v. Brown*, 520 U.S. 397, 403 (1997) (citing *Monell*, 436 U.S. at 694). An unconstitutional deprivation is caused by a municipal "policy" if it results from decisions of a duly constituted legislative body or an official whose acts may fairly be said to be those of the municipality itself. *Brown*, 520 U.S. at 403-04. Similarly, "custom" has come to mean an act that, although not formally approved by an appropriate decision maker, has such widespread practice as to have the force of law. *Id.* at 404.

In the district court, Mr. Marshall based his claims for municipal and supervisory liability in large part on the evidence from the Midland investigation and various racial incidents involving the Hobbs police force, which, he contended, demonstrated negligence in hiring, training, and supervision on the part of Captain Knott and the "deliberate indifference," or possibly "official

policy or custom" of the City.[13]  Because these issues were not addressed by the

_____

[13] Hobbs, a town of under 30,000 residents, has been involved in a number of legal actions challenging the conduct of its police department.  In March of 1999, several individuals filed a class action lawsuit against the department on behalf of all African-American citizens of Hobbs.  Compl., *Johnson v. City of Hobbs*, No. CIV 99-348 (D.N.M. Jan. 11, 2002).  The suit alleged that police engaged in a pervasive pattern and practice of unlawful searches and seizures, physical abuse and police harassment.  *Id.* ¶¶ 26-28.  The parties reached a settlement agreement in May of 2001, mandating that the department "take all steps necessary . . . to communicate and continue to communicate to its employees that the HPD does not tolerate racially derogatory remarks and/or conduct by its employees."  Stipulated Agreement at 2-3, *Johnson* (No. CIV 99-348).  Among other things, the agreement requires officers to receive additional training in diversity issues (particularly racial profiling, racial targeting, and inappropriate communication), use-of-force procedures, and integrity and ethics.  *Id.* at 27-28.  The settlement also requires the maintenance of statistics regarding individual officers' behavior patterns as well as the race of citizens subjected to police contacts.  *Id.* at 4-10.  Allegations that the police department has not complied with its obligations under the agreement are the subject of ongoing litigation.  *See* Pls.' Mot. for Order for Sanctions and for Compliance with Stipulated Agreement, *Johnson* (No. CIV 99-348).

Also in 1999, two African-American citizens filed a complaint against four Hobbs Police officers (including Officer Porter), Chief Tony Knott and the City of Hobbs.  Compl., *Hodge v. Rhoads*, No. CIV 99-561 (D.N.M. Nov. 8, 2000).  The events arose from a riot that erupted during a high school football game.  *Id.* ¶¶ 19-39.  The officers were sued for  various civil rights violations on the night of the riot and for harassment of the plaintiffs on subsequent occasions.  *Id.* ¶¶ 68-69, 73-74.  Chief Knott and the City were sued for perpetuating a pattern of abuse and for maintaining inadequate training.  *Id.* ¶¶ 106-27.  Damages were recovered against two officers for wrongful arrest, but the remaining defendants, including Officer Porter and Chief Knott, were found not liable.  *See* Special Verdict, *Hodge* (No. CIV 99-561).  In undisclosed agreements, the City settled the supervisory and municipal liability claims.  *See Hodge*, at 1.

The events of this riot also spawned another case, *Collopy v. City of Hobbs*, No. CIV 00-807 (D.N.M. Dec. 13, 2000), *rev'd and remanded*, 27 Fed. Appx. 980 (10th Cir. Dec. 26, 2001).  Collopy served as the special master, in juvenile court, over the prosecution of Hodge (the named plaintiff in *Hodge v. Rhoads*)  for his

(continued...)

-44-

district court and will be affected by the court's ruling on the admissibility and

significance of the Midland evidence, we remand to the district court to address

these claims in the first instance.

---

[13](...continued)
conduct at the football game and the ensuing riot.  In his capacity as the special
master, Collopy found Hodge not guilty, and noted in his verdict that  Hodge's
"civil rights may have been violated."  *Collopy*, 27 Fed. Appx. at 982-83.
Thereafter, Collopy filed a complaint against the City and Chief Knott alleging
that Chief Knott violated his First Amendment rights by retaliating against him
for his verdict in Hodge's case.  After a full trial, including an appeal to this
Court, the jury found that Captain Knott had retaliated against Collopy for
exercise of his First Amendment rights, and awarded nominal damages.  Special
Verdict, *Collopy* (No. CIV 00-807).  On Collopy's motion, that judgment was
recently vacated because of pending settlement negotiations.  Order Granting Pl.'s
Unopposed Mot. to Vacate J., *Collopy* (No. CIV 00-807).

Hobbs and its police department have been defendants in several other civil
rights suits. *See Perez v. City of Hobbs*, No. CIV 92-103 (D.N.M. Jan. 4, 1994)
(jury awarded $3.3 million on an excessive force/wrongful death suit brought
under § 1983); *Kaspar v. City of Hobbs*, 90 F. Supp. 2d 1313 (D.N.M. 2000),
*appeal dismissed for want of jurisdiction*, 32 Fed. Appx. 521 (10th Cir. Apr. 1,
2002), *dismissed pursuant to settlement sub nom. Chapman v. City of Hobbs*, No.
CIV 99-262 (D.N.M. July 10, 2002) (section 1983 suit for Fourth Amendment
violations against several police officers, Chief Knott, and the City); *Olivas* v.
*City of Hobbs*, 50 Fed. Appx. 936 (10th Cir. Nov. 7, 2002) (civil rights suit
against several police defendants, including Officer Porter, and the City of Hobbs,
alleging that evidence was planted during an investigation; one jury found that
evidence had been planted, but due to a jury note suggesting improper jury
instructions, a second trial was required, in which the jury absolved all defendants
of liability); *Carter v. Hobbs Police Dep't*, No. 97-2045, 1998 WL 31437 (10th
Cir. Jan. 28, 1998) (affirming dismissal of a complaint against various Hobbs
police defendants as frivolous; the complaint alleged two separate claims of false
arrest, conspiracy with magistrates, interception of mail, denial of medical
treatment, and coercion to change plea to no contest); *Powell v. Carter*, No. 98-
2225, 1999 WL 314587 (10th Cir. May 19, 1999) (affirming dismissal of claims
of malicious prosecution, false arrest, and false imprisonment against Hobbs
police defendants).

E.  *The Medical Defendants*

The district court granted summary judgment in favor of the Medical Defendants on all claims. Although the district court's order granting summary judgment in favor of the Medical Defendants was based on its order granting summary judgment in favor of the Hobbs Defendants, which we have reversed in part, we affirm the district court's decision with respect to the Medical Defendants on other grounds.

Mr. Marshall's initial and amended complaints failed to specify which claims were directed at the Medical Defendants, as opposed to those directed at the Hobbs Defendants exclusively. The district court reasoned that since the Medical Defendants were only involved in the blood test, their potential liability is necessarily limited to that procedure. Adopting this assumption, we interpret Mr. Marshall's complaint as asserting that the seizure of his blood violated his Equal Protection and Fourth Amendment rights, and that this act constituted battery and negligence *per se* under New Mexico law.

To sustain a claim under the Equal Protection Clause, a plaintiff must provide evidence that he was treated differently from others who are similarly situated to him, and that the acts forming the basis of the plaintiff's claim were motivated by a discriminatory purpose. *See Pers. Adm'r of Mass. v. Feeney*, 442 U.S. 256, 272-74 (1979); *Village of Arlington Heights,* 429 U.S. at 264-66. Mr. Marshall admits that there are no facts showing disparate treatment or racially

motivated discrimination by the Medical Defendants. Thus, we uphold the district court's dismissal of the equal protection claim against the Medical Defendants.

As to the Fourth Amendment, the evidence in the record, interpreted in the manner most favorable to Mr. Marshall, does not support liability on the part of the Medical Defendants. The record shows that Iris Goad, the nurse on duty at Columbia Lea Regional Hospital, administered the blood test at the behest of police officers Porter and Roye, who signed the consent form. She knew that Mr. Marshall verbally refused to consent but did not otherwise resist the taking of his blood. Neither she nor any other employee of the Hospital was otherwise involved, or had any further knowledge about the circumstances.

We are not aware of any decisions of the Supreme Court or of this court regarding the liability of medical personnel for performing a warrantless and coerced blood test at the instruction of a police officer, but other cases provide a close and persuasive analogy. First, nurses have been permitted to rely on the representations of other nurses that parental consent has been obtained for the medical examinations of children. *Dubbs*, 336 F.3d at 1217 & n.15. If it is reasonable for nurses to rely on other nurses regarding consent, we see no reason to doubt it is reasonable for nurses to rely on police officers regarding probable cause and exigent circumstances.

Similarly, courts have held that police officers may ordinarily rely on determinations made by other officers regarding the constitutional legitimacy of

-47-

police procedures.  In *Whiteley v. Warden*, 401 U.S. 560, 568 (1971), the Supreme Court noted that "police officers called upon to aid other officers in executing arrest warrants are entitled to assume that the officers requesting aid [had properly determined the existence of] probable cause."  *See also Baptiste v. J.C. Penney Co.*, 147 F.3d 1252, 1260 (10th Cir. 1998) (for qualified immunity purposes, female officer called in by another officer to conduct pat-down search of female suspect is entitled to rely on first officer's determination of probable cause); *Ramirez v. Butte-Silver Bow County*, 298 F.3d 1022, 1027-28 (9th Cir. 2002), *cert. granted on other grounds sub nom. Groh v. Ramirez*, 123 S.Ct. 1354 (2003) (in the qualified immunity context, distinguishing between officers who lead the search and "are responsible for ensuring that they have lawful authority for their actions," and line officers who "may accept the word of their superiors that they have a warrant and that it is valid"); *Caldarola v. Calabrese*, 298 F.3d 156, 166-67 (2d Cir. 2002) (reversing denial of qualified immunity because an officer is entitled to rely on factual accuracy of information supplied by his superiors).

The same is true of private persons assisting the police.  In *Warner v. Grand County*, 57 F.3d 962, 965 (10th Cir. 1995), this Court held that a private party who assisted in a search could not be sued under § 1983 when she "followed the ostensibly legitimate orders of a state official for the mere purpose of assisting the state with its investigatory powers."  *See also Rodriques v. Furtado*,

950 F.2d 805, 815 (1st Cir. 1991) (holding that a doctor could not be sued for performing a body cavity search pursuant to an allegedly defective search warrant).

Many of these decisions arose in the context of a claim of qualified immunity, rather than on the merits of the constitutional claim. Here, the Medical Defendants do not assert qualified immunity, but argue that performing a search at the behest of the ostensibly legal order of a police officer is not unreasonable and hence not a violation of the Fourth Amendment. We agree. The qualified immunity cases which we have cited did not rest on the lack of "clearly established statutory or constitutional rights," *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982), but rather on the theory that private parties or police officers relying on the orders or determinations of other law enforcement officials are entitled to qualified immunity because such reliance is "objectively reasonable." *See, e.g.*, *Baptiste*, 147 F.3d at 1260 (actor entitled to qualified immunity if actions are objectively reasonable). Since the Supreme Court has "long held that the 'touchstone of the Fourth Amendment is reasonableness,'" *Ohio v. Robinette*, 519 U.S. 33, 39 (1996) (quoting *Florida v. Jimeno*, 500 U.S. 248, 250 (1991)), this rationale goes to the merits of the § 1983 claim, not just to the availability of qualified immunity. *See Dubbs*, 336 F.3d at 1217 n.15.

Nurses and other medical personnel have neither the training nor the information that would be necessary to second-guess police determinations

regarding probable cause, exigent circumstances, and the like. If police officers, trained in Fourth Amendment law and specifically charged to conduct their activities in conformance with the Constitution, are entitled to rely on legal or factual determinations made by other officers, then nurses should be able to do the same. To hold medical personnel liable would impose a greater constitutional duty on medical professionals than on law enforcement, an outcome having no basis in either logic or precedent. *See Rodriques*, 950 F.2d at 815, *cited approvingly in Warner*, 57 F.3d at 965; *Ruppel v. Ramseyer*, 33 F.Supp.2d 720, 729 (C.D. Ill. 1999) (under state law, medical personnel are not liable for damages for police-ordered blood tests).

While not conclusive on the federal question of liability under § 1983, it is noteworthy that New Mexico, like many other states, has enacted a statute requiring that medical personnel, rather than police, administer blood tests to DUI suspects, and immunizing them from liability when acting pursuant to police requests:

> Only a physician, licensed professional or practical nurse or laboratory technician or technologist employed by a hospital or physician shall withdraw blood from any person in the performance of a blood-alcohol test. No such physician, nurse, technician or technologist who withdraws blood from any person in the performance of a blood-alcohol test that has been directed by any police officer . . . shall be held liable in any civil or criminal action for assault, battery, false imprisonment or any conduct of any police officer, except for negligence . . . .

N.M. Stat. Ann. § 66-8-103.  Subject to minor variations, similar laws have been passed by most states in this circuit.  *See* Kan. Stat. Ann. § 32-1132(c); Okla. Stat. tit. 47 § 752(A)-(B); Utah Code Ann. § 41-6-44.10(5); Wyo. Stat. Ann. § 31-6-106.  This suggests a strong legislative consensus consistent with our legal conclusion here.

We therefore conclude that the district court correctly granted the Medical Defendants' motion for summary judgment.

F.    *State Law Claims*

After dismissing all of Marshall's federal claims on summary judgment, the district court dismissed the remaining claims pursuant to 28 U.S.C. § 1367(c)(3).  As we have reinstated certain federal claims against the Hobbs Defendants, we remand the related state law claims to the district court for reconsideration.

### III.   Conclusion

For reasons set forth above, we AFFIRM the district court's grant of summary judgment as to all claims against the Medical Defendants.  We REVERSE the grant of summary judgment in favor of the Hobbs Defendants on the Equal Protection claim and on the Fourth Amendment claim arising from the warrantless blood test, as well as the related supervisory and municipal liability claims and state law claims, and REMAND for further proceedings consistent with this opinion.

Finally, we note that although Mr. Marshall was represented by counsel before the district court, he proceeds *pro se* on this appeal. The decision of whether to appoint counsel in a civil case under § 1983 is left to the discretion of the trial court. *Shabazz v. Askins*, 14 F.3d 533, 535 (10th Cir. 1994). We have previously cited to the Fourth Circuit's understanding that "if it is apparent to the district court that a pro se litigant has a colorable claim but lacks the capacity to present it, the district court should appoint counsel to assist him." *McCarthy v. Weinberg*, 753 F.2d 836, 838 (10th Cir. 1985) (citing *Gordon v. Leeke*, 574 F.2d 1147, 1153 (4th Cir. 1978)); *see also Miller v. Glanz*, 948 F.2d 1562, 1572 (10th Cir. 1991) (same). Because we hold that certain of Mr. Marshall's claims survive the Hobbs Defendants' summary judgment motion, on remand the district court should consider whether to appoint counsel to assist him in presenting his surviving claims.