**UNITED STATES of America, Plaintiff,**

v.

**James Earl LINDSEY, Defendant.**

No. 03–40011–01–JAR.

United States District Court, D. Kansas.

Oct. 23, 2003.

---

64. *See id.* at 648.

Donald R. Hoffman, Jason P. Hoffman, Hoffman & Hoffman, Topeka, KS, for Defendant.

*OMNIBUS ORDER DENYING DEFEN-DANT'S MOTIONS FOR DISCOV-ERY, DISMISSAL AND SUPPRES-SION*

ROBINSON, District Judge.

Defendant James Earl Lindsey has filed three pretrial motions in this case: a Motion for Discovery (Doc. 15); a Motion to Dismiss (Doc. 14); and a Motion to Suppress (Doc.17). On June 20 and July 31, 2003 the Court heard evidence concerning the discovery, dismissal and suppression motions and took the matters under advisement. Defendant filed a supplemental pleading in support of his motion to suppress (Doc. 38) as well as a second, pro se Motion to Suppress (Doc. 47).[1] Based on the evidence presented, the Court concludes that the motion for discovery should be denied, as Defendant has failed to make the requisite showing of discriminatory effect and discriminatory intent. Having made an insufficient showing for purposes of his discovery motion, Defendant has also failed to present evidence warranting a dismissal of this case on grounds of selective enforcement in violation of the Equal Protection Clause. Defendant's motion to suppress was based in part on his claim of selective enforcement; and the other grounds underlying his motions to suppress fail as well.

**Facts**

*The Traffic Stop*

On November 25, 2002, Defendant was driving a van eastbound on Interstate 70 in Saline County, Kansas. Trooper Craig Davis testified that as he was patrolling that stretch of the highway, he spotted Defendant's Ford Windstar van, which attracted his attention for several reasons: the van was very dirty, the license plate was covered with dirt, and there was an odd looking wind deflector projecting from the roof of the van that did not appear to be factory installed. Trooper Davis, who was traveling westbound on the highway when he spotted the van, turned around to see if the dirty license plate was legible, as the law requires. Davis observed that the registration sticker and expiration date of the license plate were obscured; but he was able to read the letters and numbers on the plate and ascertain that it was a Georgia license plate. There was snow dropping off the van; Davis surmised that the van had been driven through a snowstorm, probably coming through the Colorado Rockies, as there had been no snowfall in Kansas that day.

As he followed the van, Trooper Davis also noticed that the windshield was cracked, with a crack snaking upwards, from the bottom of the driver's side of the windshield to the passenger's side. From his vantage point, following the van and parallel with the van at one point, Trooper Davis believed that the windshield crack affected the driver's sight line, which constituted a violation of Kansas law.[2] Troop-

---

1. Defense counsel Ron Wurtz withdrew from the case at defendant's request on August 15, 2003; Don Hoffman was appointed counsel on October 9, 2003. Defendant's pro se motion to suppress was filed on October 16, 2003.

2. K.S.A. 8–1741(b) forbids a person to "drive any motor vehicle with a damaged front windshield or side or rear windows which substantially obstructs the driver's clear view of the highway or any intersecting highway."

er Davis testified that while the van was moving, it appeared that the crack was higher in the windshield than it actually was. After Trooper Davis stopped the van, he could see that there was a single hairline crack, without any webbing or starring of the glass, that did not necessarily obstruct the driver's view. But, Trooper Davis testified, the driver's line of vision could be adversely affected by the angle of the sun, as well as ambient vehicle lights shining through the cracked area.

At approximately 10:17 a.m., Trooper Davis effected a stop of the van, because of the cracked windshield. Trooper Davis testified that although he could see that the driver was black, even before he turned around to follow the van, the driver's race was not the reason he effected the traffic stop. Trooper Davis testified that he has stopped whites, Hispanics and Asians for having cracked windshields.

Upon stopping the van, Trooper Davis spoke with Defendant, the driver. He asked Defendant for his license and told him that he needed to get his cracked windshield repaired. Trooper Davis asked for the car registration and proof of insurance, and Defendant handed the registration to him. Defendant told Trooper Davis that he was returning from a trial in California and in connection with the trial, he had to provide the proof of insurance to the police officers in California, explaining why it was not currently in his possession. Trooper Davis did not try to confirm this information.

Trooper Davis observed that there was a spray of bullet or buckshot holes in the passenger side window of the van. When Davis asked Defendant about the bullet holes, he responded that some "guys in blue" did it, and that the jury trial in Santa Rosa, California, was related to the shooting incident. Based on his training and experience, Trooper Davis thought that the incident might be gang-related. Docu-

ments seized during the trooper's subsequent search included pamphlets from a victim assistance program in the Sonoma County court, as well as hospital records showing that Defendant had been treated for injuries sustained during the shotgun blast.

The car was registered in the name of Allen Nash; Defendant's name was not on the registration. Trooper Davis asked "who is this?" Defendant responded "Allen Nash." Defendant explained that he was a co-owner and was making payments on the van. Trooper Davis then asked whether Nash was a "buddy or relation?" Defendant stuttered, paused briefly and responded "yeah," not specifying which. Defendant appeared to be distracted by going through papers at the time this question was posed, stating that he had his receipt and that it was his vehicle. Davis could not determine whether the registration was current, because when he ran the tag number, the response was that no such tag number was on file. Trooper Davis did not ask any follow-up questions about Nash.

Trooper Davis testified that he detected a strong odor of air freshener coming from the van, which he scored at "11" on a scale of 1 (weak) to 10 (strong). Trooper Davis testified that one or two air fresheners could not produce this strong an odor, and speculated that it would take at least 15 air fresheners to produce the odor, or someone dumping a liquid or powder freshener on the carpet or interior of the van. Based on his training and experience, Trooper Davis thought this was significant, because couriers often use such substances to mask the odor of drugs, contraband or alcohol.

Trooper Davis observed several other notable things about Defendant and the van. Defendant's eyes were bloodshot and glassy. Trooper Davis considered this an

indication that Defendant had been driving a long time; in Trooper Davis's experience drug couriers tend to drive for long periods of time with inadequate rest. Trooper Davis also noticed that there was trash on the floor and a considerable amount of luggage in the back compartment of the van. Defendant told Trooper Davis that he was traveling cross country to Georgia. Trooper Davis did not ask Defendant if he was tired, or how long he had been driving. Trooper Davis had not observed any driving behaviors that indicated driver fatigue.

Trooper Davis testified that he decided to ask Defendant for consent to search, based on all of his observations, as well as Defendant's comments and the fact that the vehicle was not registered in Defendant's name. Trooper Davis testified that his desire to search was primarily motivated by the strong odor of air freshener, as well as the bullet holes in the vehicle. To that end, Trooper Davis called Trooper Patrick for back-up during the search. While Trooper Davis waited for Trooper Patrick to arrive, and about 10 minutes after the traffic stop commenced, the dispatcher advised Trooper Davis that there was a warrant issued for Defendant in Georgia for obstruction of police, but the authorities were not willing to extradite. Under these circumstances, Trooper Davis testified, his law enforcement agency does not arrest on the basis of the warrant. Trooper Patrick, who has been a certified canine dog handler since September 2000, arrived with his dog, Baro, who has been certified since 1999.

Trooper Davis returned to the van and asked Defendant about the warrant. Trooper Davis issued Defendant a warning ticket for the cracked windshield and ticketed Defendant for no proof of insurance, a violation of Kansas law, but told him that if he submitted proof that the insurance papers were in the possession of the police,

the ticket would be dismissed. Davis told Defendant "that's all, have a safe trip, thank you." He then stepped back from the van and asked Defendant if he had anything illegal in the van, such as guns. Defendant said no, and Davis asked if he could search the van. Defendant refused consent to search.

Trooper Patrick asked Defendant to exit the van. While Defendant stood on the side of the road, the troopers walked around the van. Davis mentioned to Patrick that he smelled "some fragrance" coming out of the van and pointed out the bullet holes. Patrick's dog alerted on his first pass at the back gate area of the van, and upon his second pass at the rear door seam on the driver's side. The dog, who is an "aggressive alert" dog, alerted by scratching at the area. Patrick testified that when the odor of the drugs is strong or pervasive, the dog cannot necessarily indicate the exact location of the drugs, but will alert to the vehicle, establishing probable cause.

After the dog alerted, Trooper Davis searched the van, and found crack cocaine and a gun in a natural void behind an access panel in the rear roof area, as well as a small amount of marijuana under the dashboard. Trooper Davis also found the source of the odor; in numerous places in the van's cargo area were open bottles of pine fragrance cleaner, rags soaked in the cleaner, and air fresheners.

### Racial Profiling

In addition to the evidence concerning the traffic stop, search and seizure, the Court heard evidence concerning Defendant's claim that Trooper Davis stopped him solely on the basis of his race or ethnicity, or in today's parlance, because of racial profiling. Trooper Davis produced the ten-day reports of his law enforcement activities, but none of these reports identified the subjects or motorists by race or

ethnicity. At the July 31, 2003 hearing the Court granted Defendant's request to pursue discovery of Saline County's records of traffic tickets and warnings, through the Kansas Open Records Act. The Court granted Defendant's request that he be allowed to supplement the record on or before 14 days after the July 31, 2003 hearing. Defendant has not supplemented the record with any additional evidence.

As additional evidence of racial profiling, Defendant offered the *Lamberth*[3] study, which was commissioned by the Governor of Kansas. The Defendant and the government presented expert statistical and research testimony regarding the validity of the *Lamberth* study and other studies that have attempted to evaluate claims of racial profiling. This evidence was also presented in the case of *United States v. Mesa–Roche,* Case No. 03–40151–JAR, and is summarized in detail in the Court's order denying the motion for discovery entered in that case on October 23, 2003. The Court shall not reiterate its summary of the evidence in that case, but shall rely upon it by reference, in ruling in this case.

The *Lamberth* study collected data from seven law enforcement agencies in Kansas, comparing the racial and ethnic composition of motorists the officers stopped with a "transient motorist benchmark," that is, the measured number of motorists of various races and ethnic groups that those officers could expect to be exposed to in their area of patrol. Defendant cites as relevant to his case, portions of the study that recorded the race and ethnicity of motorists stopped by the Kansas Highway Patrol in 2002, and its conclusion that the Kansas Highway Patrol improperly targeted African–American travelers for stops along Kansas Interstates.

With respect to the Kansas Highway Patrol, the *Lamberth* study recorded stops in the following locations: 1) Topeka: I–70 from I–435 to I–470 and the I–470 loop around the City of Topeka; 2) Wichita: I–35 from the Oklahoma state line to Mile Marker 50; 3) Colby: I–70 from the Colorado state line to Mile Marker 50; and 4) Osage County: I–35 between Mile Markers 144–168. The *Lamberth* study did not include Saline County.

## Analysis

### A. Fourth Amendment

*Legitimacy of Traffic Stop*

 In order to make a traffic stop, Trooper Davis needed reasonable suspicion that a traffic violation had or was occurring. Tenth Circuit cases "establish that a traffic stop is reasonable under the Fourth Amendment at its inception if the officer has either (1) probable cause to believe a traffic violation has occurred ... or (2) a reasonable articulable suspicion that 'this particular motorist violated any one of the multitude of applicable traffic and equipment regulations of the jurisdiction.' "[4] Reasonable suspicion is defined as a "particularized and objective basis" for believing the person being stopped is committing or did commit a violation.[5] This standard requires less proof than probable cause and much less proof than beyond a reasonable doubt that a traffic violation occurred. Trooper Davis's observation of a crack that spanned the entire width of the windshield and which ap-

**3.** John C. Lamberth, Ph.D., *Racial Profiling Study and Services: A Multijurisdictional Assessment of Traffic Enforcement and Data Collection in Kansas* (Police Foundation, 2003).

**4.** *United States v. Ozbirn,* 189 F.3d 1194, 1197 (quoting *United States v. Botero–Ospina,* 71 F.3d 783, 787 (10th Cir.1995) (en banc) (further quotations and citations omitted), *cert. denied* 518 U.S. 1007, 116 S.Ct. 2529, 135 L.Ed.2d 1052 (1996)).

**5.** *United States v. Cortez,* 449 U.S. 411, 417–18, 101 S.Ct. 690, 66 L.Ed.2d 621 (1981).

peared to be in the driver's field of vision supplied reasonable suspicion to support the traffic stop. Moreover, the dirty license plate with an obscured expiration date supplied further reasonable suspicion to effect the traffic stop, for Kansas law requires that a license plate be clearly visible and unobstructed.[6]

### Continued Detention after Consent to Search Refused

Although the initial stop of the van was legitimate, any further detention must be "reasonably related in scope to the circumstances which justified the interference in the first place," as required under *Terry*.[7] "Generally, an investigative detention must 'last no longer than is necessary to effectuate the purpose of the stop.' "[8] It must be temporary, and its scope must be carefully tailored to its underlying justification.[9] Upon issuing a citation or warning and determining the validity of the driver's license and right to operate the vehicle, the officer usually must allow the driver to proceed without further delay.[10]

A longer detention for additional questioning is permissible under two circumstances: (1) the officer has an objectively reasonable and articulable suspicion that illegal activity has occurred or is occurring; or (2) the initial detention changes to a consensual encounter.[11] Because Defendant did not consent to the search, the encounter was not consensual,

and additional detention must have been based on a reasonable suspicion. Trooper Davis had such reasonable suspicion, based on his observations and Defendant's comments, even before Davis had asked for consent to search. Defendant's appearance indicated he might be fatigued and he admitted he was traveling cross country. There was a strong odor of air fresheners, a reasonable indicator of the presence of drugs or contraband. Defendant was not the registered owner of the vehicle and was unclear about his relationship to the registered owner. Defendant was traveling from Santa Rosa, California, a source state of controlled substances, and related that he had been involved in a shooting incident, by the men "in blue," some indication of gang-related activity. There was a warrant issued for obstruction of the police, although no extradition was desired.

Although any one of these factors might be explained away, the Supreme Court recently reiterated that in making reasonable-suspicion determinations, courts must look at the "totality of the circumstances" of each case to see whether the detaining officer has a "particularized and objective basis" for suspecting legal wrongdoing.[12] The Court stressed that "[t]his process allows officers to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that 'might well elude an untrained per-

6. Kan. Stat. Ann. § 8–133 (1991).

7. *Terry v. Ohio*, 392 U.S. 1, 20, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968).

8. *United States v. Patten*, 183 F.3d 1190, 1193 (10th Cir.1999) (quoting *Florida v. Royer*, 460 U.S. 491, 500, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983)).

9. *United States v. Gutierrez–Daniez*, 131 F.3d 939, 942 (10th Cir.1997), *cert. denied*, 523 U.S. 1035, 118 S.Ct. 1334, 140 L.Ed.2d 494

(1998); *United States v. Wood*, 106 F.3d 942, 945 (10th Cir.1997).

10. *Patten*, 183 F.3d at 1193; *United States v. Anderson*, 114 F.3d 1059, 1064 (10th Cir. 1997).

11. *United States v. Hunnicutt*, 135 F.3d 1345, 1349 (10th Cir.1998).

12. *United States v. Arvizu*, 534 U.S. 266, 272, 122 S.Ct. 744, 151 L.Ed.2d 740 (2002).

son.'"[13] While it is true that under the Defendant's analysis, any one of Trooper Davis's factors may be explained away, the Court concludes that these factors when taken as a whole sufficiently caused the trooper to have a reasonable suspicion of criminal activity that justified a prolonged investigative detention.

### Probable Cause for Dog Sniff

■ A canine sniff of an already legitimately detained automobile is not a "search" within the meaning of the Fourth Amendment.[14] Accordingly, the Court holds that the evidence seized from the Defendant's van is admissible.

### Racial Profiling

Defendant further contends that Trooper Davis's decision to stop was motivated by Defendant's race, and is therefore unreasonable under the Fourth Amendment. Trooper Davis has testified that although he was aware of Defendant's race, it was not the motivation for his stop. For the reasons set forth in this order *infra* denying Defendant's claims for violations of the Equal Protection Clause, the Court concludes that Defendant's evidence does not show that Trooper Davis's stop was premised on racial discrimination.

Defendant's Fourth Amendment challenge fails.

### B. Motion for Discovery

■ Defendant moves to discover law enforcement records and information identifying the racial or ethnic identity of motorists stopped, arrested or cited by Trooper Davis. Such a motion for discovery requires that a defendant present some evidence that tends to show the essential elements of a selective prosecution claim: discriminatory effect and discriminatory intent.[15]

The Court notes that it recently denied the motion for discovery based on similar evidence alleging racial profiling in *United States v. Mesa–Roche*, 02–40151–JAR, October 23, 2003. Again, the Court shall not reiterate its analysis in that case, but shall rely upon it by reference in ruling in this case.

■ The Court adds the following observations. Defendant has offered no evidence of discriminatory effect. To prove discriminatory effect in a race-based selective enforcement claim, a defendant must either make a credible showing that a similarly situated individual of another race could have been stopped for a traffic violation, but was not;[16] or the defendant must show discriminatory effect through the use of statistical evidence. Defendant did not produce evidence of Trooper Davis's incidence of stopping blacks and other races or ethnic groups. The Court gave Defendant an additional 14 days to request relevant records through the Kansas Open Records Act, but he has not supplemented the record with any additional evidence. Defendant has not offered reliable statistical evidence concerning Trooper Davis's incidence of traffic stops of blacks or other minorities, nor any evidence of a similarly situated individual.

Further, the *Lamberth* study has no probative value in this case for several

---

13. *Id.* (quoting *United States v. Cortez*, 449 U.S. at 417–418, 101 S.Ct. 690).

14. *United States v. Hunnicutt*, 135 F.3d at 1350.

15. *United States v. Bass*, 536 U.S. 862, 122 S.Ct. 2389, 153 L.Ed.2d 769 (2002); *United States v. James*, 257 F.3d 1173, 1178 (10th Cir.2001)(quoting *United States v. Armstrong*, 517 U.S. 456, 468, 116 S.Ct. 1480, 134 L.Ed.2d 687 (1996)).

16. *Marshall v. Columbia Lea Regional Hospital*, 345 F.3d 1157 (10th Cir.2003); *James* 257 F.3d at 1179 (citing *Armstrong*, 517 U.S. at 465, 116 S.Ct. 1480).

reasons. First, the Court did not admit the conclusions [17] of this study, because the author of the study was not called as a witness. Second, although the Court admitted the *Lamberth* study's data, the study did not collect data on Trooper Davis, nor the Saline County Sheriff's Office.[18] Although the Kansas Highway Patrol was included in the study, neither Trooper Davis nor the stretch of I–70 that he patrols was included in the survey. Unlike the evidence in *Mesa–Roche*, Defendant presented no evidence to justify extrapolating the transient motorist data from the areas studied in *Lamberth* to the area patrolled in Saline County by Trooper Davis.[19] Finally, even if the *Lamberth* study included comparable data, Defendant has failed to provide any relevant stop data on Trooper Davis to use in comparison.

Nor has Defendant offered any evidence that Trooper Davis acted with discriminatory intent. To establish discriminatory intent the defendant must produce some evidence tending to show that the trooper acted with discriminatory purpose specific to his own case and must support an inference that racial considerations played a part in his treatment.[20] There must be some showing of "bad faith" for an "invidious reason." [21] Defendant has not submitted any evidence of discriminatory intent that is specific to his own case.[22] Trooper Davis denies being motivated by racial animus or discrimination. Defendant offered no evidence that Trooper Davis exhibited racial animus through word or deed.

Defendant's motion for discovery is denied.

## C. Motion to Dismiss

Defendant's motion to dismiss is based on a violation of the Equal Protection Clause, to-wit: selective enforcement. Needless to say, since Defendant has not

---

**17.** The *Lamberth* study concluded that in most of the seven agencies surveyed, the incidence of actual traffic stops of Hispanic and black motorists far exceeded the transient motorist population of those groups, suggesting that officers were stopping such motorists for suspect reasons.

**18.** The study attempted to survey 10 law enforcement agencies in Kansas, including large, medium and small agencies. But, only seven agencies were effectively surveyed: Overland Park; Wichita; Emporia; Olathe; Osage County; Park City; and Kansas Highway Patrol. Three agencies submitted inconclusive or incomplete data and thus were not included in the analysis: Kansas City, Hutchinson and Marysville.

**19.** In *Mesa–Roche*, defendant presented evidence that the transient population relevant to that case, in Russell County, Kansas, was comparable to the Colby–Colorado transient population developed in the *Lamberth* study.

**20.** *Armstrong*, 517 U.S. at 468, 116 S.Ct. 1480; *McCleskey v. Kemp*, 481 U.S. 279, 292, 107 S.Ct. 1756, 95 L.Ed.2d 262 (1987).

**21.** See *United States v. Amon*, 669 F.2d 1351 (10th Cir.1981); *Barton v. Malley*, 626 F.2d 151, 154 (10th Cir.1980).

**22.** *See Marshall*, 345 F.3d at 1168–70 (inference of officer's intent where defendant offered evidence that he did not commit the alleged traffic violation, the officer made eye contact with him prior to activating his emergency lights, the officer's accusation that defendant was on crack, the officer's racial designation on the citation form where none was called for, and extensive alleged misconduct of the officer during his prior employment as a police officer); *United States v. Jones*, 159 F.3d 969, 978 (6th Cir.1998)(granted discovery, finding adequate showing of discriminatory intent in evidence that arresting police officers taunted defendant by the mailing of a racially charged postcard, by wearing of custom-made T-shirts with inappropriate personalized language and pictures of defendant and his wife).

satisfied the threshold showing required for discovery relating to his claims, he has not made a prima facie showing of selective enforcement. Accordingly, Defendant's motion to dismiss is also denied.

**IT IS THEREFORE ORDERED BY THE COURT** that the Defendant's: Motion for Discovery (Doc. 15) is DENIED; Motion to Dismiss (Doc. 14) is DENIED; and Motions to Suppress (Doc. 17 and 47) are DENIED.

IT IS SO ORDERED.