UNITED STATES of America, Plaintiff,

v.

**Norman A. PARADA, et al., Defendants.**

No. 03–40053–01/02/04–JAR.

United States District Court, D. Kansas.

Nov. 4, 2003.

1294

Marilyn M. Trubey, Office of Federal Public Defender, Topeka, KS, for Defendant.

James A. Brown, Office of United States Attorney, Topeka, KS, for Plaintiff.

### OMNIBUS ORDER DENYING DEFENDANTS' PRETRIAL MOTIONS

ROBINSON, District Judge.

Defendants are charged with one count of conspiracy to distribute 100 grams or more of PCP and one count of possession with intent to distribute 100 grams or more of PCP. The Court conducted an evidentiary hearing on August 25, 2003, on the following motions:

Motion to Suppress Evidence (Poulin) (Doc. 48)

Motion to Dismiss or Suppress Evidence (Poulin) (Doc. 50)

Motion to Join Pretrial Motions of Co–Defendant (Poulin) (Doc. 59)

Motion to Marry (Parada) (Doc. 53)

Motion to Suppress (Parada) (Doc. 54)

Motion for Discovery Related to Drug Dog (Parada) (Doc. 55)

Motion to Dismiss for Destruction of Evidence (Parada) (Doc. 56)

Motion to Suppress Evidence from Cellular Phone (Parada) (Doc. 57)

Motion to Dismiss based on Racial Profiling (Parada) (Doc. 58)

Motion to Suppress (McNeill) (Doc. 60)

Motion to Join other Motions (McNeill) (Doc. 61)

Motion for *James* hearing (McNeill) (Doc. 62)

After hearing arguments from counsel, the Court ruled orally on several of the motions as follows: Defendant Poulin and McNeil motions to join Parada's pretrial motion (Doc. 59 and 60) were granted; defendant Parada's motion to marry (Doc. 53) was denied; defendant Parada's motion for discovery related to drug dog (Doc. 55) was denied; and defendant McNeil's motion for *James* hearing (Doc. 62) was granted. The Court took the re-maining motions under advisement. Having reviewed the evidence and arguments of counsel, the Court is prepared to rule.

### Facts

On March 12, 2003, Officer Jim Oehm stopped an eastbound silver Ford van bearing Maryland tags on I–70 near milepost 309, in Geary County, Kansas. Officer Oehm is a Junction City police officer, and is also a sworn deputy for Geary County. He thus has law enforcement authority in both the city and the county. Oehm has been an officer with the county-wide Junction City Drug Task Force since 1999. Oehm testified that he has approximately 120 hours of drug interdiction training and is also trained as a drug dog handler.

Officer Oehm stopped the van because he observed it cross the right line of the highway twice, then drive on the line, in violation of K.S.A. 8–1522(a). He testified that the road conditions were normal and traffic conditions were optimal, with no strong winds or precipitation. Oehm testified that he decided to stop the van because of the violation and because he felt it was necessary to check on the welfare of the driver and occupants. He further testified that before he stopped the van, he could see the driver was a white female. He could tell that there were occupants in the vehicle, but could not see them because the windows were tinted.

The officer approached the driver, Kelly Bradley, and observed John McNeill in the front passenger seat and Tiffany Poulin and Norman Parada lying down in the back seat. Defendants Parada, McNeill and Poulin are African–American. When he approached the van, the officer noticed that the rear windows were open and he saw three pine air fresheners hanging in the rear of the van. He could also detect the strong odor of air freshener and ob-

served three more fresheners hanging from the steering wheel.

Officer Oehm asked defendant Bradley for her license and insurance. She stated that the van was a rental and produced an agreement, along with a Virginia driver's license. The officer noted that Bradley was breathing rapidly, had a "panicked" look on her face, and that her hands were trembling as she handed him the paperwork. The officer asked Bradley about her travel plans and she advised that she was coming from a wedding in Colorado and going home to Virginia.

Officer Oehm returned to his patrol car and ran the information through dispatch. From the rental agreement, he determined that the van was not rented to Bradley or any other occupant in the van, but to "Saketha Champion." The rental agreement showed no additional drivers, although the name "Kelly Ann Bradley" had been penned in blue ink over printed language on the agreement indicating that no drivers other than the renter were permitted. The rental agreement also provided that the van was not to be driven out of Maryland, with the exception of "DC, VA, NC, SC."

Officer Oehm returned to the van and told Bradley that the rental agreement seemed to be expired. She replied that she had obtained an extension over the phone. Officer Oehm then returned Bradley's license and documentation to her and issued a warning ticket for the traffic violation. The officer took one step back, then asked her, "Can I ask you a couple of questions quick?" and Bradley replied, "sure." He then asked her why she was traveling I–70 back from Colorado to Virginia, when I–80 is a more direct route. Bradley replied that I–70 was the only route she knew. Bradley then initiated some conversation about directions, which the officer answered. Oehm then asked Bradley, "You guys aren't bringing back anything illegal with you from Colorado, are you?" Bradley looked over at McNeill and replied that she was not. The officer then asked Bradley, "Would you have a problem if I checked quick to make sure?" and Bradley replied, "check what?" The officer stated, "check the vehicle and make sure there's nothing illegal … to see if you're not carrying drugs or weapons … do you have a problem if we check to make sure?" Bradley then asked "why?" Without responding further, the officer told Bradley that he would run his drug dog, Rico, around the vehicle, stating: "Well, I'll tell you what, I'll just grab the dog and walk the dog around, be right back." Oehm testified that when he didn't get a response to the question posed, he decided to use the dog, because in his training he learned that when motorists won't answer questions or ask questions in response to an officer's questions, that is a sign of deception.

Officer Oehm retrieved Rico from his vehicle and walked the dog around the van. The dog gave a positive alert for the presence of illegal drugs while near the area of the driver's window-he had rapid nasal breathing, his body stiffened and he tried to jump into the vehicle, leading Oehm to believe that the dog was trying to pinpoint where the odor was coming from. Oehm testified that Rico did not "indicate" because he could not get to the source of the odor. Oehm pulled him back from jumping into the window because Rico is an aggressive indicator and scratches, barks and bites when he alerts.

Officer Oehm put the dog back in his patrol car, returned to the van, and told the occupants that they were going to have to step out of the vehicle. They complied and stood on the side of the road. By this point, Lt. Rich Jimerson of the Kansas Highway Patrol had arrived on the scene as backup to the officer. Oehm testified

that if the defendants had requested to leave the scene, he would have continued the search of the vehicle.

Officer Oehm conducted a roadside search of the van. He located a large cooler in the rear, covered by bags of clothing. He noted that there was no "wedding attire" in the van. Inside the cooler, he observed two large bottles of Tree Top apple juice, a Gatorade bottle, several bottles of water and ice. The officer opened the apple juice bottles and detected an "overwhelming" chemical odor emitting from the bottles. Some of the fluid splashed on Oehm's finger, which started to tingle and burn. He asked defendants what was in the bottle, but none replied. He put the cooler in Trooper Jimerson's patrol vehicle.

At the officer's request, Bradley and the occupants followed him to the Junction City Police Department warehouse, where he continued the search of the van. DEA agents Greg Russell and Craig Wurdeman arrived, processed the contents of the containers, retrieved samples for testing, and took photographs. A positive result for PCP was obtained on the contents of the apple juice containers. The agents then contacted Ferguson–Harbour, a hazardous materials disposal company, who came to the scene and disposed of the chemicals. The samples were sent to the DEA for testing, and results of that testing indicated that the two apple juice containers had contained approximately 340 grams of PCP, with an estimated street value of $448,000. Officer Oehm also found a small amount of marijuana in the front passenger door map pocket.

A cell phone belonging to defendant Parada was also found in the van during the search. DEA Agent Craig Wurderman testified that he searched the memory of the cell phone at the warehouse. He did not seek a search warrant before searching the cell phone memory.

### Racial Profiling

In addition to the evidence concerning the traffic stop, detention, and search and seizure, the Court was presented with evidence concerning the defendants' claim that Officer Oehm stopped them and the government decided to prosecute them, solely on the basis of their race or ethnicity, or in today's parlance, because of racial profiling. Defendants offered evidence of a compilation of files of the Federal Public Defender for the District of Kansas Topeka Office for drug cases which resulted from stops of defendants on the interstate highways of Kansas. Defendant contends that the results show that 52% of the 31 defendants stopped were Hispanic, and that if three other defendants who could be mistaken for Hispanic were included, the results would rise to 61%.

As additional evidence, Defendant offered the *Lamberth* [1] study, commissioned by the Governor of Kansas. The parties have stipulated that the Court may take judicial notice of the evidence and testimony presented at the hearing before it in the cases of *United States v. James Earl Lindsey*, 288 F.Supp.2d 1196, Case No. 03–40011, 2003 WL 22429265 (D.Kan.2003), and *United States v. Luis Mesa–Roche*, 288 F.Supp.2d 1172, Case No. 02–40151, 2003 WL 22427825 (D.Kan.2003), on July 31, 2003. This evidence consisted of expert statistical and research testimony regarding the validity of the *Lamberth* study and other studies that have attempted to evaluate claims of racial profiling. On October 30, 2003, the Court denied the motions for discovery and dismissal in the above cases, and shall not reiterate its summary of the evidence in those cases,

---

1. John C. Lamberth, Ph.D., *Racial Profiling Study and Services: A Multijurisdictional As-* sessment of Traffic Enforcement and Data Collection in Kansas (Police Foundation, 2003).

but shall rely upon it by reference, in ruling in this case.

The *Lamberth* study collected data from seven law enforcement agencies in Kansas, comparing the racial and ethnic composition of motorists the officers stopped with a "transient motorist benchmark," that is, the measured number of motorists of various races and ethnic groups that those officers could expect to be exposed to in their area of patrol. Defendants cite as relevant to their case, the entire study and its conclusion that Kansas law enforcement officers improperly targeted Hispanic travelers for stops along Kansas Interstates.

With respect to Interstate 70, where Defendants were stopped, the *Lamberth* study recorded stops in the following locations: (1) Topeka: I–70 from I–435 to I–470 and the I–470 loop around the City of Topeka; (2) Wichita: I–35 from the Oklahoma state line to Mile Marker 50; (3) Colby: I–70 from the Colorado state line to Mile Marker 50; and (4) Osage County: I–35 between Mile Markers 144–168. The *Lamberth* study did not include Geary County.

Officer Oehm testified that Geary County does not keep information on warning tickets. He testified that, out of curiosity, he pulled his activity records of citations and warnings issued for the last 18 months, and broke it down by race as follows: 74% white; 14% black; and 13% Hispanic.

## Analysis

### A. Jurisdiction

■ Defendant Poulin asserts that because Officer Oehm was employed by the Junction City Police Department as a city police officer, his jurisdiction was limited by K.S.A. 22–2401(a)(2) to the city limits of Junction City, except when he is on property owned or controlled by the city, re-sponding to a request for assistance, or in fresh pursuit. Defendants claim that because the stop occurred outside the city limits, a fact the government concedes, the officer was outside of his jurisdiction and had no authority as a private citizen to make the stop.

At the time of the stop, Officer Oehm was assigned to the "Junction City/Geary County Drug Operations Group," and wore two hats: one of a city police officer and one of a deputy with the Geary County Sheriff's Department, having been sworn as a deputy under K.S.A. 19–805 on November 4, 1999. Accordingly, as a deputy, the officer had authority to be operating outside the city limits pursuant to K.S.A. 22–2401a(1)(a), which provides "[l]aw enforcement officers employed by consolidated county law enforcement agencies or departments and sheriffs and their deputies may exercise their powers as law enforcement officers: (a) anywhere within their county." Thus, Officer Oehm had authority to stop the defendants on I–70.

### B. Fourth Amendment

Defendants Parada, Poulin and McNeil move to suppress evidence seized from the van on several grounds. The Court will discuss each in turn.

### Standing

The Government argues that defendants, who were passengers in the vehicle that was stopped and searched, do not have standing to seek to suppress the items seized from the van because they were passengers who did not own the van, and were without a legitimate expectation of privacy. Even if defendants were not illegally detained, as the defendants were in *United States v. DeLuca,*[2] none meet the "but for" test which requires that each of them show that the evidence would not have been discovered but for their *own*

---

**2.** 269 F.3d 1128, 1134 (10th Cir.2001).

unlawful detention. Here, none of the defendants requested to leave the scene in the van, and they cannot show they would have been able to do so had they asked. Even if they had left, the van still would have been searched and drugs would have been found.

Defendants contend that they have standing to seek to suppress the items seized from the van because the van was unlawfully stopped and they were unlawfully detained. Defendants distinguish their case from *DeLuca* because: (1) there was no consent to search, and (2) at the state court preliminary hearing, Officer Oehm testified that defendants would not have been allowed to leave had they requested to do so. In addition, a causal connection exists between the unlawful stop and detention, because the alleged PCP would not have been discovered but for the illegalities, and thus is fruit of the violation.

 It is well established that passengers have no reasonable expectation of privacy in a vehicle when the passenger neither asserts a proprietary or possessory interest in either the vehicle or its contents.[3] However, it is recognized that persons do not shed their individual interests in being free from unlawful seizures merely because they are traveling as passengers in automobiles.[4] Therefore, unlike a driver or owner of a vehicle, as a passenger, a defendant may not directly challenge the search of the vehicle.[5] Such a defendant may only challenge his detention. Hence, the issue for the court is twofold: (1) whether defendant was unlawfully detained; and (2) whether the seized evidence and the statements obtained were the fruit of the unlawful detention.[6]

### Legitimacy of traffic stop

Defendants argue that the initial stop violated the Fourth Amendment because no traffic violation was occurring, characterizing the alleged infraction, crossing the "fog line," as "the traffic violation of choice for law enforcement officers who are looking for any reason to stop a vehicle." Defendants also claim that the officer's stop was pretextual.

 In order to make a traffic stop, Officer Oehm needed reasonable suspicion that a traffic violation had or was occurring. Tenth Circuit cases "establish that a traffic stop is reasonable under the Fourth Amendment at its inception if the officer has either (1) probable cause to believe a traffic violation has occurred ... or (2) a reasonable articulable suspicion that 'this particular motorist violated any one of the multitude of applicable traffic and equipment regulations of the jurisdiction.'"[7] Reasonable suspicion is defined as a "par-

3. *Rakas v. Illinois,* 439 U.S. 128, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978).

4. *See United States v. Eylicio–Montoya,* 70 F.3d 1158, 1163 (10th Cir.1995).

5. The Court notes that use of a drug dog to walk around the exterior of a defendant's car does not escalate the traffic stop into a search. *See City of Indianapolis v. Edmond,* 531 U.S. 32, 121 S.Ct. 447, 148 L.Ed.2d 333 (2000). Consent is not required for a dog sniff of a lawfully detained vehicle. *U.S. v. Diaz–Borjas,* 188 F.3d 519 (10th Cir.1999). A canine sniff of an already legitimately detained automobile is not a "search" within

the meaning of the Fourth Amendment. *U.S. v. Hunnicutt,* 135 F.3d 1345, 1350 (10th Cir. 1998).

6. *United States v. Miller,* 84 F.3d 1244, 1250 (10th Cir.1996), overruled on other grounds by *United States v. Holland,* 116 F.3d 1353 (10th Cir.1997).

7. *United States v. Ozbirn,* 189 F.3d 1194, 1197 (10th Cir.1999) (quoting *United States v. Botero–Ospina,* 71 F.3d 783, 787 (10th Cir.1995) (en banc) (further quotations and citations omitted), *cert. denied* 518 U.S. 1007, 116 S.Ct. 2529, 135 L.Ed.2d 1052 (1996)).

ticularized and objective basis" for believing the person being stopped is committing or did commit a violation.[8] This standard requires less proof than probable cause and much less proof than beyond a reasonable doubt that a traffic violation occurred.

 Officer Oehm testified that he observed the driver of the van cross the "fog line" of the highway twice, then drive on the line. This is sufficient to believe that the driver was violating K.S.A. 8–1522, which requires that a vehicle be "driven as nearly as practicable entirely within a single lane." As this Court has stated before, "[w]hen the officer observes a vehicle straying from the lane more than once, over a period of time or distance, the need to consider other facts is not as great, for repeated straying is stronger evidence that the driver's straying from the lane is not due to external circumstances, and that staying in the lane was not impracticable."[9] In any event, there is no evidence that defendant's straying from the driving lane is attributable to external circumstances. There were no strong winds or precipitation and travel conditions were optimal. In other words, there was no apparent reason for the van straying from its driving lane. Officer Oehm's stop of the van was justified at its inception.

### Lawful Detention

Defendants argue that when consent to search the van was refused, the officer detained the van and its occupants for the purpose of taking his dog around the van. This continued detention was unlawful, defendants argue, as it was not reasonably related to the reason for the traffic stop.

 Even if the initial stop of defendants' vehicle was legitimate, the detention must be "reasonably related in scope to the circumstances which justified the interference in the first place," as required under Terry.[10] "Generally, an investigative detention must 'last no longer than is necessary to effectuate the purpose of the stop.'"[11] It must be temporary, and its scope must be carefully tailored to its underlying justification.[12] Upon issuing a citation or warning and determining the validity of the driver's license and right to operate the vehicle, the officer usually must allow the driver to proceed without further delay.[13]

 A longer detention for additional questioning is permissible under two circumstances: (1) the officer has an objectively reasonable and articulable suspicion that illegal activity has occurred or is occurring; or (2) the initial detention changes to a consensual encounter.[14]

 As noted above, Officer Oehm returned defendant Bradley's driver's license and other documents after issuing a warning, then immediately asked if he could ask defendants a couple of questions. After he

**8.** United States v. Cortez, 449 U.S. 411, 417–18, 101 S.Ct. 690, 66 L.Ed.2d 621 (1981).

**9.** United States v. Vercher, 250 F.Supp.2d 1290, 1295–96 (D.Kan.2003); see United States v. Ozbirn, 189 F.3d at 1197.

**10.** Terry v. Ohio, 392 U.S. 1, 20, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968).

**11.** United States v. Patten, 183 F.3d 1190, 1193 (10th Cir.1999)(quoting Florida v. Royer, 460 U.S. 491, 500, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983)).

**12.** United States v. Gutierrez–Daniez, 131 F.3d 939, 942 (10th Cir.1997), cert. denied 523 U.S. 1035, 118 S.Ct. 1334, 140 L.Ed.2d 494 (1998); United States v. Wood, 106 F.3d 942, 945 (10th Cir.1997).

**13.** Patten, 183 F.3d at 1193; United States v. Anderson, 114 F.3d 1059, 1064 (10th Cir. 1997).

**14.** United States v. Hunnicutt, 135 F.3d 1345, 1349 (1998).

questioned them about their travel route, he asked if they were transporting anything illegal. When Bradley responded no, he asked if he could check the vehicle to make sure. When defendant Bradley failed to give an answer, she effectively refused consent to search, and the encounter was rendered non-consensual.

◼ There being no consensual encounter, the extended detention of the defendants is lawful only if the officer had a reasonable and articulable suspicion of criminal activity.[15] Officer Oehm testified that he had reasonable cause to detain the defendants because: (1) of Bradley's extreme nervousness; (2) there were many air fresheners in the van, including the back compartment; (3) the one day term of the rental agreement had already expired; and (4) the vehicle had been rented by a third party, who was neither driving nor a passenger, and the agreement stated that there were no additional authorized drivers.

The defendants attempt to discount each of the individual factors. However, the Supreme Court recently reiterated that reasonable suspicion rests on the "totality of the circumstances" and whether the officer has a "particularized and objective basis" for suspecting legal wrongdoing.[16] The Court stressed that "[t]his process allows officers to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that 'might well elude an untrained person.' "[17] While under the defendants' analysis, any one of the officer's factors may be explained

away, the Court concludes that these factors when taken as a whole sufficiently caused the officer to have a reasonable suspicion of criminal activity that justified a prolonged investigative detention. Notably, less than two minutes expired between the time that Officer Oehm returned the license and documents to Bradley and the time that the dog alerted on the van.

After Rico alerted, Officer Oehm told defendants to get out of the van and they stood by while the officers conducted a roadside search. Officer Oehm testified that he considered defendants to be in custody at that time. Despite the government's arguments to the contrary, the Court finds that a reasonable person would not believe he was free to leave when an officer is searching his vehicle while he stands by on the side of an Interstate highway.

◼ In any event, once the dog alerted, it was reasonable to continue the detention of defendants during the search of the van. Use of a drug dog to walk around the exterior of a defendant's car does not escalate the traffic stop into a search.[18] Consent is not required for a dog sniff of a lawfully detained vehicle.[19] A canine sniff of an already legitimately detained automobile is not a "search" within the meaning of the Fourth Amendment.[20]

### Probable cause to search van

Defendants argue that Officer Oehm did not have probable cause to search the van for two reasons: (1) the dog did not alert

---

**15.** See United States v. Turner, 928 F.2d 956 (10th Cir.), cert. denied 502 U.S. 881, 112 S.Ct. 230, 116 L.Ed.2d 187 (1991).

**16.** United States v. Arvizu, 534 U.S. 266, 271, 122 S.Ct. 744, 151 L.Ed.2d 740 (2002).

**17.** Id. (quoting United States v. Cortez, 449 U.S. at 417–418, 101 S.Ct. 690).

**18.** See City of Indianapolis v. Edmond, 531 U.S. 32, 121 S.Ct. 447, 148 L.Ed.2d 333 (2000).

**19.** United States v. Diaz–Borjas, 188 F.3d 519 (10th Cir.1999).

**20.** United States v. Hunnicutt, 135 F.3d at 1350.

in the first place and any alleged alert was "fictitious" and (2) the officer's search exceeded the permissible scope that would have been authorized had the dog provided a valid alert. The Court rejects both of defendants' arguments.

First, Officer Oehm testified that the dog's alert was not fictitious. While not trained to detect PCP, the dog is trained to detect the odor of other drugs. Officer Oehm testified that he did not permit the dog to indicate because it was trying to indicate by jumping through the window of the van. Officer Oehm testified that he interpreted the dog's alert to encompass the entire interior of the vehicle and that the odor of marijuana was most likely the basis of the alert, given a small amount was found in the front passenger door map pocket.

▮ Probable cause means that "there is a fair probability that contraband or evidence of a crime will be found in a particular place." [21] The Tenth Circuit has held that "[a] dog alert usually is at least as reliable as many other sources of probable cause and is certainly reliable enough to create a 'fair probability' that there is contraband," [22] and has held in several cases that a dog alert without more gave probable cause for searches and seizures.[23] There is no evidence in this case that the dog had a poor accuracy record or was not properly trained. The Court thus finds that the drug alert by Rico in this case

provided probable cause for the search of the van.

▮ Second, the object of the search, drugs, could have been located anywhere within the interior of the vehicle, and was not limited to the area on which the dog alerted. Supreme Court precedent makes clear that once probable cause is established to search a vehicle, that search may, related to the object sought, extend to all parts of the vehicle and all containers therein.[24] Although the Tenth Circuit has held that probable cause to search the interior of a vehicle does not always create probable cause to search the trunk,[25] in this case, the vehicle was a van that had no trunk. The dog's alert on odors emanating from the interior of the vehicle provided probable cause to search the entire interior of the van. Moreover, there were other circumstances that contributed to the officer's determination of probable cause. There were several air fresheners hanging in the rear compartment of the van, and the rear window vents of the van were open, suggesting an attempt to mask or minimize odor.[26]

Defendants' Fourth Amendment challenge fails.

## C. Motion to Dismiss for Destruction of Evidence

▮ Defendants move to dismiss this case on the basis that the government's

---

**21.** *Illinois v. Gates*, 462 U.S. 213, 238, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983).

**22.** *United States v. Ludwig*, 10 F.3d 1523, 1527–28 (10th Cir.1993).

**23.** *Id.* (citations omitted).

**24.** *See United States v. Ross*, 456 U.S. 798, 825, 102 S.Ct. 2157, 72 L.Ed.2d 572 (1982) ("If probable cause justifies the search of a lawfully stopped vehicle, it justifies the search of every part of the vehicle and its contents that may conceal the object of the search").

**25.** Cf. *United States v. Nielsen* 9 F.3d 1487 (10th Cir.1993)[officer who smelled burnt marijuana inside a vehicle did not have probable cause, based solely on the smell, to search the vehicle's trunk.]

**26.** *See United States v. Klinginsmith*, 25 F.3d 1507, 1510 (10th Cir.1994) (holding that "when the dog 'alerted,' there was probable cause to arrest [defendants] and the search the *vehicle* without a warrant under the automobile exception..." ) (emphasis added) (dog alerted on outside quarter-panel).

destruction of the liquid found in the apple juice containers, allegedly PCP, "denies the defense the opportunity for independent testing and analysis of these items," which denies them the right to due process and a fair trial. Specifically, defendants complain that they cannot determine with accuracy the quantity and purity of the liquid.

In *California v. Trombetta*,[27] the Supreme Court held that a defendant's due process rights are violated by government destruction of evidence when (1) the evidence possesses an exculpatory significance that was "apparent before" its destruction; and (2) the defendant is unable to "obtain comparable evidence by other reasonably available means."[28] In *Arizona v. Youngblood*,[29] the Court expanded these principles to potentially useful evidence destroyed in bad faith. But the government does not necessarily engage in bad faith conduct when the destruction of evidence results from a standard procedure employed by the government or agency regarding disposal of the evidence, at least where there is adequate documentation of the destroyed evidence.[30]

Defendants fail to establish a *Trombetta* violation because they do not show or allege that any of the items destroyed had exculpatory value that was apparent before their destruction. Defendants' characterization of the prejudice suffered-denial of "the opportunity for independent testing and analysis"—at best deems the destroyed evidence "potentially useful," which is not enough to establish a violation. Defendants have not alleged that an insufficient sample remains for them to independently test if they desire; and before its destruction, the liquid was duly weighed and the weight was documented. Defendants also fail to meet the *Youngblood* standard because they fail to show or allege that the officers acted in bad faith. Here, the PCP was disposed of by a hazardous materials company because PCP is a hazardous substance whose storage poses "obvious risks." Any inference of bad faith is also rebutted by the fact that samples were taken and tested, the evidence was photographed and evidence custody receipts were prepared.

Defendants' motion to dismiss is denied.

## D. Motion to Suppress Evidence Seized from Cellular Phone

Defendant Parada argues that the search of his cell phone memory without a warrant was in violation of his Fourth Amendment rights as well as the Electronic Communications Privacy Act (ECPA), 18 U.S.C. § 2701. The Court rejects defendant's arguments.

Because the cell phone was seized incident to the arrest of the defendants, it is properly within the scope of an inventory search. The separate question is whether it was permissible for officers to note the numbers of incoming phone calls stored in the cell phone memory. In this case, the evidence indicated that exigent circumstances justified the retrieval of the phone numbers. Because a cell phone has a limited memory to store numbers, the agent recorded the numbers in the event that subsequent incoming calls effected the deletion or overwriting of the earlier stored numbers. This can occur whether the phone is turned on or off, so it is irrelevant whether the defendant or the officers turned on the phone. The Court

---

**27.** 467 U.S. 479, 104 S.Ct. 2528, 81 L.Ed.2d 413 (1984).

**28.** *Id.* at 489, 104 S.Ct. 2528.

**29.** 488 U.S. 51, 109 S.Ct. 333, 102 L.Ed.2d 281 (1988).

**30.** *United States v. Bohl,* 25 F.3d 904 (10th Cir.1994).

concludes that under these circumstances, the agent had the authority to immediately search or retrieve, as a matter of exigency, the cell phone's memory of stored numbers of incoming phone calls, in order to prevent the destruction of this evidence.[31]

■ The Court further concludes that the phone numbers stored in the memory of the cell phone are not a "communication" subject to the requirements of the ECPA. Defendant does not cite, nor did the Court find, any authority that the ECPA applied in these circumstances. Generally, the Act does not apply unless there is an interception, that is, an aural or other acquisition, of the contents of a communication.[32] Recorded phone numbers in a cell phone's memory are not the contents of a communication; rather, the contents would be the substance of the conversation-something that can be heard. By contrast, a recorded text message on the phone appears to be a communication that is intercepted, although not auraly.[33] But mere phone numbers that are recorded because a third party pulsed in a number from their phone are not communications.[34] Thus, the ECPA does not apply to this case. Accordingly, there was no con-

stitutional violation of the defendant's rights; the agent legally accessed the memory of the cell phone under the exigency exception to the warrant requirement, and retrieval of the numbers from the memory of the cell phone does not violate the ECPA.[35] Defendant's motion to suppress is denied.

### E. Motion for Discovery

Defendant Parada is African–American, but is "by appearance, identifiable as a person of either Hispanic or African–American origin." Defendants Poulin and McNeill, who are also African–American, join in Parada's motion. Defendants base their motion for discovery and dismissal on (1) the *Lamberth* racial profiling study and (2) statistics from the FPD Topeka office files allegedly showing that 52% of the 31 defendants stopped on interstate highways and prosecuted in Topeka were Hispanic.

■ Defendants move to discover law enforcement records and information identifying the racial or ethnic identity of motorists stopped, arrested or cited by Officer Oehm and the Junction City Police Department. Such a motion for discovery requires that a defendant present some

---

31. *See, e.g., United States v. Meriwether,* 917 F.2d 955, 957 (6th Cir.1990) (officers seized defendant's pager; later activation of pager to obtain defendant's number is no more intrusive than the later opening of a personal telephone book to obtain what might be incriminating evidence); *United States v. Reyes,* 922 F.Supp. 818, 833–34 (S.D.N.Y.1996) (pager seized incident to arrest; access of memory soon after seizure not remote in time, thus suppression denied).

32. 18 U.S.C. § 2511 (interception of wire, oral, or electronic communications and disclosure of contents prohibited except as otherwise provided). "Interception" is defined as "the aural or other acquisition of the contents of any wire, electronic, or oral communication through the use of any electronic, mechanical, or other device." 18 U.S.C. § 2510(4). An "aural transfer" means a

transfer containing the human voice at any point. 18 U.S.C. § 2510(18).

33. "Electronic communication" is defined as any transfer of signs, signals, writing, images, sounds, data, or intelligence of any nature transmitted in whole or in part by a wire, radio, or similar system, but does not include any communication made through a tone-only paging device. 18 U.S.C. § 2510(12).

34. *Id. See United States v. Meriwether,* 917 F.2d at 960 (pressing button on a pager to access the pager's memory does not constitute an interception under the ECPA).

35. The Court further notes that the ECPA does not provide an independent statutory remedy of suppression for interceptions of electronic communications. 18 U.S.C. § 2518(10)(c); *Meriwether,* 917 F.2d at 961.

evidence that tends to show the essential elements of a selective enforcement and prosecution claim: discriminatory effect and discriminatory intent.[36]

The Court notes that it recently denied the motion for discovery based on similar evidence alleging racial profiling in *United States v. Mesa–Roche*, 288 F.Supp.2d 1172, 02–40151–JAR, 2003 WL 22427825 (D.Kan. 2003). Again, the Court shall not reiterate its analysis in that case, but shall rely upon it by reference in ruling in this case.

█ The Court adds the following observations. Defendants have offered no evidence of discriminatory effect. To prove discriminatory effect in a race-based selective enforcement claim, a defendant must either make a credible showing that a similarly situated individual of another race could have been stopped for a traffic violation, but was not;[37] or more realistically, the defendant must show discriminatory effect through the use of statistical evidence. Similarly, in a selective prosecution claim, a defendant must either make a credible showing that a similarly situated individual of another race could have been prosecuted for transporting drugs, but was not, or show discriminatory effect through statistical evidence.[38]

█ In support of their motion, defendants offer a compilation of files of the Federal Public Defender for the District of Kansas Topeka Office for drug cases prosecuted in Topeka that were initiated by stops of defendants on the interstate highways of Kansas. This data only includes two stops made by Officer Oehm and extends statewide across all of I–70, rather than Geary County where the officer patrols. While this data may be an accurate compilation of cases *prosecuted* in Topeka, it is not a comprehensive compilation of *stops* made on Kansas Interstates. Even if the compilation showed that Hispanics are being disproportionately *prosecuted*, it does not demonstrate that Hispanics are being disproportionately stopped for traffic violations on I–70. Similar evidence was rejected by this court and the Tenth Circuit in *James*.[39]

█ Notably, defendants, who are African–American, offer data on Hispanic defendants represented by the public defender's office. The Court will not generally extrapolate data on one minority group to others. But, allegations of racial profiling or selective enforcement begin with an officer's observation of a motorist's appearance. In this case, defendant Parada might be viewed as African–American by one observer, Hispanic by another observer. As this Court alluded to in its *Mesa–Roche* and *Lindsey* decisions, given that race is merely a social construct, the *Lamberth* study, the *New Jersey Study*,[40] and other similar studies have not resolved the

---

**36.** *United States v. Bass*, 536 U.S. 862, 122 S.Ct. 2389, 153 L.Ed.2d 769 (2002); *United States v. James*, 257 F.3d 1173, 1178 (10th Cir.2001) (quoting *United States v. Armstrong*, 517 U.S. 456, 468, 116 S.Ct. 1480, 134 L.Ed.2d 687 (1996)).

**37.** *Marshall v. Columbia Lea Regional Hospital*, 345 F.3d 1157 (10th Cir.2003); *James*, 257 F.3d at 1179 (citing *Armstrong*, 517 U.S. at 465, 116 S.Ct. 1480).

**38.** *James*, 257 F.3d at 1178.

**39.** *Id.*

**40.** James E. Lange, Ph.D., et al., *Speed Violation Survey of the New Jersey Turnpike: Final Report* (2001). This study was commissioned after the State of New Jersey entered into a Consent Decree with the United States to promote non-discriminatory law enforcement by New Jersey troopers under the supervision of the federal district court. Highly summarized, this study used a violator benchmark, where teams of observers recorded the race or ethnicity of turnpike motorists by studying high-quality digital photographs taken as the motorists entered the turnpike.

inherent difficulties in identifying the race or ethnicity of a particular person.

Further, the *Lamberth* study has no probative value in this case for several reasons. First, the Court did not admit the conclusions[41] of this study, because the author of the study was not called as a witness. Second, although the Court admitted the *Lamberth* study's data, the study did not collect data on Officer Oehm, nor the Junction City Police Department.[42] Although the Kansas Highway Patrol was included in the survey, neither Officer Oehm nor the stretch of I–70 that he patrols was included in the survey. Unlike the evidence in *Mesa–Roche*, defendants presented no evidence to justify extrapolating the transient motorist data from the areas studied in *Lamberth* to the areas patrolled in Geary County by Officer Oehm. Finally, even if the *Lamberth* study included comparable data, defendants have failed to provide any relevant stop data on Officer Oehm to use in comparison.

Nor have defendants offered any evidence that Officer Oehm acted with discriminatory intent. To establish discrimi-

natory intent, the defendant must produce some evidence tending to show that the officer acted with discriminatory purpose specific to his own case and must support an inference that racial considerations played a part in his treatment.[43] There must be some showing of "bad faith" for an "invidious reason."[44] Defendants have not submitted any evidence of discriminatory intent that is specific to their own case.[45] Officer Oehm denies being motivated by racial animus or discrimination. He testified that although he could tell there were occupants in the van, he could not see them well because the windows were tinted. In fact, the driver of the van, Kelly Bradley, is white, and two of the defendants were lying down in the back seat of the van when the officer made the stop. Defendants offered no evidence that Officer Oehm exhibited racial animus through word or deed.

Defendants' motion for discovery is denied.

### Motion to Dismiss

Defendants' motions to dismiss are based on a violation of the Equal Protec-

---

**41.** The *Lamberth* study concluded that in most of the seven agencies surveyed, the incidence of actual traffic stops of Hispanic and black motorists far exceeded the transient motorist population of those groups, suggesting that officers were stopping such motorists for suspect reasons.

**42.** The study attempted to survey 10 law enforcement agencies in Kansas, including large, medium and small agencies. But, only seven agencies were effectively surveyed: Overland Park, Wichita, Emporia, Olathe, Osage County, Park City, and Kansas Highway Patrol. Three agencies submitted inconclusive or incomplete data and thus were not included in the analysis: Kansas City, Hutchinson and Marysville.

**43.** *Armstrong*, 517 U.S. at 468, 116 S.Ct. 1480; *McCleskey v. Kemp*, 481 U.S. 279, 292, 107 S.Ct. 1756, 95 L.Ed.2d 262 (1987).

**44.** *See United States v. Amon*, 669 F.2d 1351 (10th Cir.1981); *Barton v. Malley*, 626 F.2d 151, 154 (10th Cir.1982).

**45.** *See Marshall*, 345 F.3d at 1168–70 (inference of officer's intent where defendant offered evidence that he did not commit the alleged traffic violation, the officer made eye contact with him prior to activating his emergency lights, the officer's accusation that defendant was on crack, the officer's racial designation on the citation form where none was called for, and extensive alleged misconduct of the officer during his prior employment as a police officer); *United States v. Jones*, 159 F.3d 969, 978 (6th Cir.1998) (granted discovery, finding adequate showing of discriminatory intent in evidence that arresting police officers taunted defendant by the mailing of a racially charged postcard, by wearing of custom-made T-shirts with inappropriate personalized language and pictures of defendant and his wife).

tion Clause, to-wit: selective enforcement and prosecution. Needless to say, since defendants have not satisfied the threshold showing required for discovery relating to their claims, they have not made a prima facie showing of selective enforcement. Accordingly, defendants' motions to dismiss are also denied.

**IT IS THEREFORE ORDERED BY THE COURT** that the defendants' Motions to Suppress (Docs. 48, 50, 54, 57, 60) are DENIED;

**IT IS FURTHER ORDERED THAT** the defendants' Motions for Discovery and Dismissal (Doc. 56 and 58) are DENIED.

IT IS SO ORDERED.